UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

STEVEN HATFILL,

       Plaintiff,

    -against-                                      04 Civ. 9577 (CM)(GAY)

DONALD FOSTER, et al.,

       Defendants.

————————————————————————x

DECISION AND ORDER DENYING DEFENDANT FOSTER'S MOTION
TO DISMISS THIS ACTION AS TIME BARRED, AND DECISION ON CHOICE OF LAW
ISSUES AS TO DEFENDANTS CONDE NAST AND READER'S DIGEST

McMahon, J.:

      This libel action was transferred to this Court from the United States District Court for

the Eastern District of Virginia (Brinkema, J.). At the time the action was transferred, a number

of substantive motions (in addition to the motion to transfer) were pending. Because Judge

Brinkema decided to transfer the case, these motions were not addressed. They are now pending

before this Court.

      The two articles that underlie this action were written by defendant Donald Foster. Foster

is a Professor of Dramatic Literature in the Department of English at Vassar College in

Poughkeepsie, New York. He specializes in the literary analysis of evidence to deduce the

identity of a person who authored certain documents (literary forensics). For example, Foster

"outed" journalist Joe Klein as the author of the political spoof "Primary Colors" based on his

analysis of Klein's writings.  He believes his skills to be useful in solving crimes where written

evidence is available (for example, letters from criminals of the sort that were periodically issued

by the so-called "Unabomber"), and he has enjoyed some success in convincing law enforcement officials of the usefulness of his theory. He gives seminars in literary forensics and he serves as a consultant to law enforcement agencies from time to time.

After the post-9/11 anthrax attacks, Foster analyzed the letters that were sent through the mail, together with other evidence, using his techniques. Sherlock Holmes-like, he reached the conclusion that the FBI ought to be focusing its investigation on the plaintiff in this action, Dr. Steven Hatfill, a physician who has his own subspeciality in a field called biodefense. When he did not receive a response from the FBI that he thought appropriate, he wrote an article entitled "The Message in the Anthrax," which appeared in the October 2003 issue of <u>Vanity Fair</u>, a Conde Nast magazine. A revised version of the article appeared in the December 2003 issue of <u>Reader's Digest</u>. The ultimate question presented by Hatfill's lawsuit is whether these articles are libelous.

After reviewing the voluminous motion papers, I have decided to address several procedural matters separately from the merits of the motions to dismiss for failure to state a claim: (i) Foster's claim that the Virginia court from which this action was transferred lacked jurisdiction over him; (ii) his subsequently articulated statute of limitations argument; and (iii) choice of law issues relating to defendants Conde Nast and Reader's Digest.

**Foster Was Not Amenable to Suit in the Eastern District of Virginia**

It may seem odd that I must address Foster's motion, pending at the time of transfer, to dismiss this case for lack of personal jurisdiction over him in the Eastern District of Virginia. It seems odd because this court has undoubted jurisdiction over Foster. He resides in this district;

he is a professor at a pre-eminent college in this district; he wrote the offending articles in this district and he caused them to be published in magazines that emanate from this district. Indeed, it was precisely because jurisdiction clearly attached to all defendants here that Judge Brinkema moved the case to New York.

However, I must deal with Foster's personal jurisdiction motion for two reasons.

The first is the validity of service. Foster was served with process emanating from a court that, he argues, could not constitutionally assert its jurisdiction over him. If that be true, then he has not been properly served. Fed. R. Civ. P. 4(k)(1); Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104-05 (1987). Indeed, in a letter motion addressed to the Court, Foster raises the possibility that he cannot now be validly served, because this lawsuit is time-barred as to him. I must, therefore, decide whether he has in fact been validly served and what, if any, effects follow, should Virginia service prove invalid.

Second, choice of law issues as to Foster will be dictated by whether the transferor court had jurisdiction over him or not. If personal jurisdiction lay in the Eastern District of Virginia, then the claims against Foster, like those against his co-defendants, will be governed by the substantive law and conflicts-of-laws principles that the Eastern District of Virginia would have applied. This rule makes sure that a transfer effects nothing more than a change of courtroom. See Van Dusen v. Barrack, 376 U.S. 612, 635-37 (1964). But if Foster was not amenable to suit in Alexandria, any claims against him will be governed by New York law. All parties appear to agree with this proposition.

So I turn first to the issue of Virginia's jurisdiction over Foster. Regrettably, it is a complicated question.

The Due Process Clause of the Fourteenth Amendment permits personal jurisdiction over a defendant in any state with which the defendant has "certain minimum contacts...such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Milliken v. Meyer, 311 U.S. 457, 463 (1940); International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Virginia has translated that rule into its long-arm statute, which, in pertinent part, permits the assertion of jurisdiction over anyone who

> caus[es] tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

Va. Code Ann. § 8.01-328.1(A)(4). Virginia's Supreme Court confirms that the Virginia Long-Arm Statute extends *in personam* jurisdiction to the outmost perimeters of due process. Kolbe v. Chromodern Chair Co., 211 Va. 736, 740 (1971).

The Fourth Circuit (under whose law this motion would of course be decided) has held that the standard for determining whether a court may exercise personal jurisdiction over a non-resident defendant depends on whether the defendant's contacts with the forum state provide the basis for the suit. Mitrano v. Hawes, 377 F.3d 402, 406-07 (4th Cir. 2004). If so, those contacts may establish "specific jurisdiction." Helicopteros Nacionales de Colombis, S.A. v. Hall, 466 U.S. 408, 414 and n. 8 (1984). Alternatively, the defendant may be subject to the general jurisdiction of the state. ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711 (4th Cir. 2002).

To decide whether specific jurisdiction exists, the Fourth Circuit examines (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3)

4

whether the exercise of personal jurisdiction would be constitutionally reasonable. <u>ALS Scan, Inc.</u>, 293 F.3d at 712. To justify an exercise of specific jurisdiction over a defendant, his actions must have been "directed at the forum state in more than a random, fortuitous, or attenuated way." <u>ESAB Group, Inc., v. Centricut, Inc.</u>, 126 F.3d 617, 625 (4th Cir. 1997). General jurisdiction requires a showing that the defendant had "continuous and significant" contacts with the forum state, a much more stringent showing. <u>Id.</u>

**1. Virginia Lacked Specific Jurisdiction Over Foster Under <u>Calder v. Jones</u>**

Plaintiff argues that specific jurisdiction lay in the Eastern District of Virginia pursuant to the United States Supreme Court's decision in <u>Calder v. Jones</u>, 465 U.S. 783 (1984), a case that is, in many critical respects, similar to ours.

<u>Calder</u> was a libel action, brought by the actress Shirley Jones against the National Enquirer, its publisher and a reporter-employee. The article was written in Florida, by a Florida citizen whose contacts with California were *de minimis*.[1] The writer moved to dismiss for lack of *in personam* jurisdiction. The United States Supreme Court, affirming the California Supreme Court, ruled that the writer had subjected himself to California's jurisdiction:

> The allegedly libelous story concerned the California activities
> of a California resident. It impugned the professionalism of an
> entertainer whose television career was centered in California. The
> article was drawn from California sources, and the brunt of the harm,

---

[1] The author, one John South, made a single trip to California in connection with the article and relied on phone calls to California sources for his primary research. The California Supreme Court concluded that the writer's contacts with California in connection with the article that was the subject of the action were sufficient to subject him to California jurisdiction on a claim arising out of those contacts. The United States Supreme Court, which affirmed the decision of the California Supreme Court on other grounds, did not need to reach this issue (which was hotly disputed as a matter of fact) and did not do so. I will address this issue when I discuss the more traditional long-arm analysis.

in terms both of respondent's emotional distress and the injury to her
professional reputation, was suffered in California. In sum, California
is the focal point both of the story and of the harm suffered.
Jurisdiction over petitioners is therefore proper in California based
on the "effects" of their Florida conduct in California.

465 U.S. at 788-89.

Calder thus articulated a standard for deciding whether a defendant's allegedly tortious

conduct was sufficiently connected to the forum to warrant a finding that he expected, or

reasonably should have expected, that his acts would have consequences within the state.

Since Calder was decided it has been narrowly construed. In Imo Industries v. Kiekert

AG, 155 F.3d 254, 256 (3d Cir. 1998), the Third Circuit announced a three part "effects" test for

deciding whether Calder jurisdiction exists: (a) defendant must have committed an intentional

tort; (b) plaintiff must have felt the brunt of the harm caused by that tort in the forum state, such

that the forum can be said to be the focal point of the harm; and (c) defendant must have

expressly aimed its tortious conduct at the forum, such that the forum can be said to be the focal

point of the harm.  I will refer to this as the Calder/Imo test.

The Calder/Imo test has been adopted in the Third and Fourth Circuits and presents an

excellent way of deciding whether Calder jurisdiction exists over Foster in this case. ESAB

Group, Inc., 126 F.3d at 622-27; Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,

334 F.3d 390, 398 n. 7 (4th Cir. 2003); Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 99-100 (3d

Cir. 2004); MoneyGram Payment Systems, Inc. v. Consorcio Oriental, S.A., 65 Fed. Appx. 844,

851, Slip Copy, No. 01-4386, 2003 WL 21186124 at ** 6-7 (3d Cir. May 21, 2003); Remick v.

Manfredy, 238 F.3d 248, 258-59 (3d Cir. 2001).

Hatfill argues that Calder jurisdiction exists because the facts of this case are on all fours

with those of <u>Calder</u>. He says that the allegedly libelous story concerned him – a one-time resident of Virginia and former employee of a Virginia firm that was specifically named in the story. It did more than impugn his professionalism – it accused petitioner, a physician-scientist, of committing murder and causing mayhem, by releasing a deadly substance into the population. He notes that the article was drawn from Virginia "sources" (Foster himself admits to having made a few phone calls to one Virginia source, but no more). And he alleges that the brunt of the harm was suffered by him in Virginia, because that is where he was employed, in a Virginia-centered industry, and that is where he is now unable to obtain employment.

Applying the <u>Calder</u>/<u>Imo</u> test to the facts before me, I conclude as follows:

*a. Defendant must have committed an intentional tort.*

Since libel is an intentional tort, plaintiff satisfies this prong of the test.

*b. Plaintiff must have felt the brunt of the harm caused by that tort in the forum state, such that the forum can be said to be the focal point of the harm caused by the defendant as a result of that tort.*

Plaintiff asserts that he felt the brunt of the harm from the alleged libel in Virginia because (1) he had substantial contacts with Virginia, and (2) the article compromised his ability to find work in the biodefense industry, which is concentrated in Virginia.

The substantial contacts are really of no moment. Plaintiff could have made a case for his being a citizen/domiciliary of the Commonwealth of Virginia, even though he is presently residing in Washington D.C. He avers that he votes in Virginia, holds a Virginia driver's license, maintains a Virginia address by renting a room from a friend, has a Virginia telephone number and pays Virginia taxes. These are all incidents of Virginia domicile (i.e., they demonstrate a fixed intent to return). Citizenship for diversity purposes follows domicile, not residence.

However, in the complaint in this action Hatfill pleads that he is a citizen of the District of Columbia. I am bound to assume that allegation to be true.

As to the second point, Hatfill avers that, since the late 1990s, he has focused his career on the biodefense industry. He claims that he moved to the Washington D.C. metro area precisely because Virginia was the place to pursue a biodefense career. Indeed, plaintiff argues that the industry is "significantly concentrated" in Virginia. The conclusion he seems to want me to draw is that he will be unemployable – at least, in his chosen field – because of the article; and since his chosen field is centered in Virginia, that is where he will really feel the impact of his unemployability.

It is undisputed that, from 1999 (when he moved to the Washington D.C. area) until 2002, Hatfill worked in Tyson's Corner, Virginia, for Science Applications International Corporation (SAIC). Indeed, he was working at SAIC at the time of the FBI's anthrax investigation, a fact cited in Foster's article. It is also undisputed that Hatfill has been hired to lecture at the CIA and the State Department Office of Diplomatic Security, both located in Northern Virginia; that he has given occasional briefings on biodefense issues at the Pentagon; and that he participated in biodefense-related seminars at Potomac Institute in Arlington, Virginia. While at SAIC, his work took him to Government agencies in Northern Virginia and Norfolk. Hatfill avers that he has never held a job in the District of Columbia, and Foster does not controvert that assertion.

Moreover, Hatfill avers, without contradiction, that a number of biodefense agencies and corporations involved in biodefense work are located in Virginia. He specifically identifies six relevant Government agencies (including, of course, the Department of Defense) that are located

in Virginia, plus five government contractors who work in biodefense, also located in Virginia.

Foster disputes Hatfill's characterization of the biodefense industry as Virginia-centered. As evidence, he submits a study from the Brookings Institution entitled <u>Signs of Life: The Growth of Biotechnology Centers in the U.S.</u> (Cortright and Mayer 2002) which, *inter alia*, lists biotechnology firms (some of which undoubtedly perform biodefense work[2]) located throughout the United States. In a footnote to his reply brief, Foster also identifies a number of sites around the country where biodefense activities take place, including Columbia University and the University of Pittsburgh. He also identifies the locations chosen by the Department of Health and Human Services to be Regional Centers of Excellence for Biodefense and Emerging Infectious Diseases Research. These include several major universities (none located in the Washington D.C. area) and the New York State Department of Health.

On this record, I cannot go so far as to endorse Hatfill's statement (which is clearly no more than his opinion) that biodefense is "significantly concentrated" in Virginia. (<u>See</u> Hatfill Aff. ¶ 6.) However, it is not necessary for me to go that far in order to determine what is relevant for purposes of personal jurisdiction. Since I am deciding this motion on the papers, plaintiff need only make a prima facie showing of personal jurisdiction, and all factual disputes must be resolved in plaintiff's favor. <u>ESAB Group, Inc.</u>, 126 F.3d at 625-26. The record demonstrates that a person who lived in the Washington D.C. Metropolitan area, and who wanted to work in the specific area of biodefense, would enjoy numerous opportunities in that field in Virginia. By contrast, the record is devoid of the name of a single firm in either Washington D.C. or Maryland

---

[2] I do not understand the terms "biotechnology" and "biodefense" to be coterminous. Biotechnology encompasses many subspecialties. Biodefense probably is one of them.

that does biodefense work.[3]

It thus appears that if Hatfill wanted to work in his chosen field without moving from the D.C. Metro area, he would need to concentrate his job search in Virginia. Since I must resolve factual disputes in the papers in plaintiff's favor, Hatfill has made a prima facie showing that he felt the brunt of the impact of the allegedly libelous article in his professional "home" of Virginia – even though he did not reside there when the article appeared.

> *c. Defendant must have expressly aimed its tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.*

The locus of plaintiff's injury is, however, only part of the equation – and not the most significant part. In case after case, courts have dismissed complaints for lack of personal jurisdiction where the plaintiff "failed to point to other actions that adequately demonstrated that the defendant[ ] targeted (or 'expressly aimed' their conduct) at the forum, and thereby showed that the forum was the focal point of the tortious activity." Imo Industries, *supra*, 155 F.3d at 263. See also, e.g., General Electric Capital Corp. v. Grossman, 991 F.2d 1376, 1387-88 (8th Cir. 1993); Noonan v. Winston Co., 135 F.3d 85, 90-91 (1st Cir. 1998). Of particular importance, the

---

[3] This is as opposed to biotechnology work. As a matter of fact, the Brookings study states that the Baltimore-Washington corridor – not Virginia – has become the Washington area's center for health-related biotechnology firms because of the location of the National Institutes of Health and the Department of Health and Human Services. I admit that I would be surprised to learn that no "biodefense" work was being done anywhere on the extensive Maryland campus of the NIH. However, no evidence in the record suggests that the work done at the biotech firms in Maryland and the District of Columbia is the kind of biodefense work in which plaintiff specializes.

If the record supported a conclusion that the biodefense industry was scattered throughout the Maryland/Virginia/District of Columbia metropolitan area, I might even find that the brunt of the effects of the article could be felt in all three jurisdictions. But I take the record as it stands. There is no evidence that biodefense work, as opposed to biotechnology work, is carried out anywhere except Virginia.

Fourth Circuit, in <u>ESAB Group, Inc.</u>, 126 F.3d at 625-26, emphasized that it is the *defendant's* expressly aiming or directing its conduct toward the forum state that matters. The defendant's state of mind matters. For example, in another libel case, <u>Remick v. Manfredy</u>, 238 F.3d 248 (3d Cir. 2001), the court found no targeting or expressly aiming when an allegedly libelous letter, addressed and faxed to the plaintiff, with no indication that it was intended to be seen by anyone else, was in fact seen by two other individuals while it was sitting in the fax machine.

Clearly, then – even under <u>Calder</u> – it is unconstitutional for a court to exercise jurisdiction over a defendant who has not specifically targeted the forum state with his out-of-state activities.

Foster contends that plaintiff has not established that he purposefully reached into Virginia through the foreseeable effects of his out-of-state conduct. He claims not to have known where Hatfill lived or worked at the time he wrote the article.[4] He argues that the content of Foster's article does not focus on Virginia or Virginia residents (of which Hatfill is not one, in any event). And he further argues that the article was not intended to sway or affect the opinion of anyone in Virginia. While disputing plaintiff's claim that he particularly felt the effects of the article in Virginia, Foster ultimately grounds his argument against the assertion of <u>Calder</u> jurisdiction on the third prong of the <u>Calder</u>/<u>Imo</u> test – no purposeful targeting of Virginia by him.

It rests with plaintiff to demonstrate that the defendant expressly aimed his conduct into Virginia. Although Hatfill argues that there are numerous indicia of Foster's intent to "target"

_____

[4] The Fourth Circuit has endorsed the proposition that knowledge of the plaintiff's place of residence or employment is not enough to confer personal jurisdiction. <u>See</u> <u>Young v. New Haven Advocate</u>, 315 F.3d 256, 263-4 (4th Cir. 2003).

Virginia with his article, in the end plaintiff fails to make out a prima facie case as to any of them.[5]

First, Hatfill notes that Foster knew that he had been employed in Virginia and suggests that Foster's knowledge of where he worked "reflects the larger fact that the biodefense industry in which he worked, and in which his reputation is most effected [sic], is heavily concentrated in this jurisdiction." (See Pl. Mem. at 36.)

That Foster knew Hatfill worked at SAIC, and that he lost his job at SAIC as a result of the FBI investigation, is borne out by the contents of the article. That a number of firms and agencies in Virginia do biodefense work I will take as established on this record. But as discussed above, Hatfill's assertion that Virginia is the center of the biodefense world is at least a debatable proposition. More important, even if Virginia were preeminent in biodefense, as plaintiff claims, nothing in this record tends to show that Foster knew that Virginia was the biodefense capital of the country. And since it is Foster's purposeful targeting of Virginia that matters for this third prong of the Calder/Imo test, it is Foster's knowledge – irrelevant to the "brunt of the harm" analysis – that matters.

Plaintiff makes no showing about Foster's knowledge of this disputable assertion of fact – not even a prima facie showing.[6]  Significantly, Hatfill gets no mileage from the fact that

_____

[5] In this regard, I note that none of the relevant facts is disputed, so there is nothing to resolve in plaintiff's favor.  I am not bound to accept as true the conclusory allegations that plaintiff draws from the facts.  See, e.g., Papasan v. Allain, 478 U.S. 265, 286 (1986).

[6] Plaintiff did not seek any jurisdictional discovery, either before Judge Brinkema or in this Court. Such discovery would have allowed plaintiff to test defendant's asserted lack of contacts through a preliminary deposition of Foster and other disclosure. That is the process normally followed in this Court. Apparently it is not the process normally followed in the Fourth Circuit.

Foster knew about his job at SAIC.  Knowing that Hatfill once had, and then lost, a biodefense job in Virginia does not lead inexorably to the conclusion that Foster knew most biodefense jobs were located in Virginia.

Hatfill argues that the article was aimed at Virginia in a different way as well: it was intended to enhance Foster's reputation as a crime-fighter and make people more likely to hire him for criminal investigative work, or for seminars like the one he conducted for the FBI. It may well be that Foster hoped to drum up business by publishing this article; I would be astonished to learn otherwise. But there is nothing in the record to suggest that he hoped specifically and especially to drum up such business *in Virginia*. Vanity Fair and Reader's Digest are circulated in every state in the Union, and criminal investigations are carried out in every state and the District of Columbia. Nothing in either the articles or the record, except plaintiff's conclusory say-so, suggests that Foster harbored a special desire to be hired as a crime-fighter in Virginia and wrote the offending article accordingly.

Hatfill next contends that the article was targeted to Virginia because Foster used Virginia sources, cited Virginia events (including a hoax letter mailed to the police in Quantico or certain gas incidents at National Airport), and commented on the actions of federal agencies headquartered in Virginia.

I am prepared to find that Foster used one source in Virginia – he admits as much. And perhaps he used even more Virginia sources, although plaintiff's barebones assertion of "sources" is insufficient to make such a showing. But a reading of the article reveals that Foster used sources in many locations throughout the country and the world. That is a far cry from the fact pattern in Calder, where the content of the article was Shirley Jones' purported conduct on

the set of her television show. Since the show was filmed in California, Californians were the only possible sources for the story.

The fact that the story mentions events that took place in Virginia, and commented on the activities of federal agents in Virginia, is of absolutely no moment. The story also mentions events that took place in Florida, New York and Washington, D.C. Again, the test is whether the defendant was specifically targeting the state where jurisdiction is at issue. The article simply does not read as though Virginia is its focus.

Next, Hatfill notes that Foster had to be aware that Vanity Fair and Reader's Digest enjoyed widespread circulation in Virginia. But those magazines are also widely circulated in other states. Nothing except plaintiff's conclusory allegation supports a finding that the magazines' Virginia readers mattered a whit more to Foster than did their New York readers or their Ohio readers.

Hatfill also focuses considerable attention on the fact that the FBI's investigation of him took place in Virginia, while he was working at SAIC. But the interviews and searches to which he refers are not the tortious conduct at issue in this case. The articles that contain the alleged libel were published many months after the FBI confronted plaintiff at his place of work. For that matter, they were published many months after plaintiff – by his own admission – lost his Virginia job. Where the FBI happened to interview Hatfill or conduct its search is irrelevant for jurisdictional purposes, because that is FBI activity, not Foster activity.

Finally, the content of the articles is always critical to deciding whether Calder jurisdiction exists. See Young, *supra*, 315 F.3d at 263-63. A fair reading of the article suggests that Foster was trying to influence the course of the anthrax investigation by persuading the FBI

to take a harder look at Hatfill, based on his analysis.

If the FBI investigation into the anthrax mailings were being wholly, or even primarily, conducted (or even coordinated) in Virginia, I suppose I could conclude that Foster was "targeting" Virginia with his article. But nothing in the record would support any such inference.[7] From the article, it appears that the FBI conducted aspects of its investigation in many different states, including all the states where the victims were poisoned and through which the tainted letters passed. (Frankly, any reader of <u>The New York Times</u> would know as much.) Agents confronted Hatfill in Virginia because he happened to be working there when they became interested in him. Since Hatfill neither lives nor works in Virginia, any continuing FBI investigation into him (assuming arguendo that this is what Foster hoped to provoke by his article) would not be centered in Virginia.

In short, the arguments that Hatfill makes to support the assertion that Foster intended to "target" Virginia in particular with his article are either wholly conclusory, or logically fallacious, or both.

### 2. Aside From <u>Calder</u> Jurisdiction There Is No Basis For Specific Jurisdiction Over Foster

Hatfill also argues that Foster's other contacts with Virginia relate to the allegedly libelous article and suffice to confer specific jurisdiction over him. He is wrong.

The parties do not appear to contest the facts concerning Foster's contacts with Virginia. Thus, I take it as conceded by all that Foster's contacts with the Commonwealth are as follows:

---

[7] The Court takes judicial notice of the fact that the FBI's headquarters are in the District of Columbia, not in Virginia. There are, of course, field offices throughout the country, including in Virginia. I have absolutely no idea where the anthrax investigation is being coordinated.

(1) In 1999 and 2001, Foster conducted three-hour seminars for the FBI in Quantico, Virginia.

(2) In 2003, Foster was retained by Virginia Commonwealth University to analyze anonymous letters that contained possible libelous material; Foster did not travel to Virginia to do this work, and he directed only a limited number of communications into Virginia while performing this consultancy.

(3) Foster directed several telephone calls to a single source in Virginia while preparing this article.

(4) Finally, Foster has traveled through Virginia on the way to other places. (Through travel does not subject anyone to jurisdiction, so I simply ignore it.)

The few telephone calls into Virginia to the single source, made while preparing the articles, do not suffice to confer specific jurisdiction over Foster, because those few calls are not a "substantial connection" to Virginia. <u>ESAB Group, Inc.</u>, 126 F.3d at 625. And contrary to Hatfill's assertion, the FBI seminars and the work done for VCU are not related to the preparation of the articles – at least not in any way that would give rise to specific jurisdiction over a non-resident.

The offending articles, the seminars and the VCU consultancy all touch on the use of literary forensics as a crime fighting tool. But the activity that gave rise to this lawsuit is not the general use of literary forensics. It is, rather, the publication of allegedly libelous articles concerning the anthrax investigation and Hatfill's status as a subject of that investigation. The FBI seminars and the VCU engagement have nothing whatever to do with the anthrax investigation. Indeed, the FBI seminars were held two and four years prior to the publication of

the article; and at least the first seminar was held prior to the anthrax attacks![8] And the VCU

incident, involving a potentially libelous letter, has nothing to do with Hatfill, anthrax, the FBI,

or any pending criminal investigation. The suggestion that these activities somehow relate to the

offending article, and so confer specific jurisdiction over Foster, is simply silly. So these three

ventures do not bear on the issue of special jurisdiction.

### 3. General Jurisdiction Does Not Lie Over Foster

Because specific jurisdiction is lacking, I am remitted to asking whether, for some

reason, Virginia could exercise general jurisdiction over Foster.

When defendant's contacts with a state are not also the basis for the lawsuit, jurisdiction

over him must arise from general and more persistent, if unrelated, contacts with the state.

Carefirst of Md., *supra*, 334 F.3d at 397. General jurisdiction lies only if the defendant's

activities in the Commonwealth of Virginia are "continuous and systematic," a far more

demanding standard than is necessary to establish specific jurisdiction. ALS Scan, *supra*, 298

F.3d at 712. The Fourth Circuit has cited with approval the statement of Professors Wright and

Miller that "threshold contacts required for general jurisdiction are very substantial, indeed." 4

Wright & Miller, Federal Practice and Procedure, § 1067 (quoted with approval in ESAB Group,

Inc., *supra*, 126 F.3d at 623-24).

In Nichols v. G.D. Searle & Co., 991 F.2d 1195 (4th Cir. 1993), the Fourth Circuit

showed that its threshold for "continuous and systematic contacts" is quite high. The court

concluded that Maryland (which also has a long-arm statute that extends to the limits of

constitutional authority) could not exercise general jurisdiction over a company (1) that

---

[8] I know that the second seminar took place in 2001, but I do not know when.

employed thirteen Maryland residents as sales representatives and one Maryland resident as district manager, (2) held district meetings three times a year in Maryland and (3) had between $9 million and $13 million in sales each year in Maryland. If that level of contact was constitutionally insufficient to confer general jurisdiction, then Foster's two short FBI seminars and one consultancy for a Virginia customer (performed from out of state) will hardly suffice.

I thus conclude that Foster was not amenable to suit in Virginia. This means the process with which he was served was invalid. Fed. R. Civ. P. 4(k)(1) makes service of a summons effective to establish in personam jurisdiction only if the defendant is amenable to the process of the serving court. Omni Capital Int'l v. Rudolph Wolff & Co., 484 U.S. 97, 103-04 (1987) (cited in ESAB Group, Inc., 126 F.3d at 622).[9] If this action is to proceed against Foster, he must be re-served.

### 4. The Statute of Limitations Does Not Bar Plaintiff's Claim Against Foster

By letter motion, Foster contends that it is too late to re-serve him, and argues for dismissal of the case, on the ground that the claims against him are barred by New York's one year statute of limitations (which had already run, at least as the to Vanity Fair publication, prior to Judge Brinkema's decision to transfer the matter to this Court).

This matter has not been fully briefed by Hatfill. However, it is not necessary to put plaintiff to the trouble of a full briefing. It is possible to decide the issue on the merits without

---

[9] In early post-Goldlawr cases (Goldlawr, Inc. v. Haiman, 369 U.S. 463, 467 (1962)), courts routinely "quashed" service of process as a means of deciding motions to dismiss for want of personal jurisdiction where the case was also filed in the wrong jurisdiction. Post-transfer, the plaintiff obtained a new summons from the transferee court and re-served the defendant. When the transferor court does not decide the issue of jurisdiction before transferring, strange issues remain for determination by the transferee court.

18

further argument.

The fallacy in Foster's argument that this action is time barred is that the statute of limitations was tolled when the complaint in this action was <u>filed</u>, not when he was served. This is true whether federal or state law governs the time of commencement, since both the United States and New York are "commencement by filing" courts.  Fed. R. Civ. P. 3; N.Y.C.P.L.R. § 304. So whether or not the Eastern District of Virginia had jurisdiction over Foster, the action against him was *commenced* when it was filed in Alexandria.  That date – August 23, 2004 – is within New York's one year limitations period (which applies to Foster) as well as Virginia's two year period (which applies to the other defendants).

Even though Judge Brinkema lacked personal jurisdiction over Foster, she had undoubted power to transfer Hatfill's case against him to this District. In <u>Goldlawr, Inc. v. Haiman</u>, 369 U.S. 463, 467 (1962), the United States Supreme Court ruled that a case in which venue was improperly laid could be transferred to a different district pursuant to 28 U.S.C. § 1406(a), even though the transferor court lacked personal jurisdiction over two of the defendants and the transferee court had jurisdiction over those defendants. Subsequent cases in inferior federal courts reached the same result if the transfer was effected on *forum non conveniens* grounds pursuant to 28 U.S.C. § 1404(a). <u>Callan v. Lillybelle, Ltd.</u>, 234 F. Supp. 773 (D.N.J. 1964); <u>Kaiser v. Mayo Clinic</u>, 260 F. Supp. 900 (D. Minn. 1966) (and cases cited therein). Clearly, under <u>Goldlawr</u> and its progeny, Foster's lack of amenability to suit in Alexandria was no bar to sending him here.

Forty years ago, the interplay among personal jurisdiction, statutes of limitations and transfers was much litigated in the wake of congressional enactment of the transfer statutes.  At

that time, a judge in Judge Brinkema's position, confronted with both a motion to dismiss for lack of personal jurisdiction and a motion to transfer, would ordinarily have decided the jurisdictional issue first, and only then made a decision about whether to transfer. If the court found no personal jurisdiction over a defendant (and, in the parlance of the day, "quashed" service), but then transferred the case, the plaintiff would obtain process in the transferee court and re-serve the defendant. When the statute of limitations had passed by the date of the second service, defendants routinely moved to dismiss the claims asserted against them. After Goldlawr, they routinely lost. See, e.g., Goldlawr, 369 U.S. at 466; Internatio-Rotterdam, Inc. v. Thomsen, 218 F.2d 514, 516-17 (4th Cir. 1955); Callan, 234 F. Supp. at 775-80; Orzulak v. Federal Commerce & Navigation Co., 168 F. Supp. 15, 18 (E.D. Pa. 1958).

Today, busy transferor courts are more likely to do what Judge Brinkema did – transfer the case and leave any pending jurisdictional motion undecided, in the perfectly understandable belief that the issue might never need to be addressed. But that does not alter the analysis of the earlier cases concerning the relationship among personal jurisdiction, transfer and statute of limitations. This lawsuit is the same lawsuit that was commenced in Virginia. It is not a new lawsuit. The Virginia lawsuit was not dismissed; it was transferred here, with Foster still very much a defendant. The statute of limitations, then, was tolled on the date the action was originally filed in Virginia. That is the result Congress was trying to reach when it passed the transfer statutes. "It is generally recognized that the transfer provisions (or at least § 1404(a) were designed to prevent the loss of a cause of action by dismissal when the statute of limitations has run." Kaiser, 260 F. Supp. at 909. It was not terminated before it was transferred.

More significantly, I am not terminating the action now as to Foster. To the extent Foster

sought dismissal of the action in the Eastern District of Virginia, his motion is indeed moot, as plaintiff argues, because the action is no longer pending in the Eastern District of Virginia. I was forced, for reasons having nothing to do with my jurisdiction over the case, to address the jurisdictional arguments that Foster made, but I am not dismissing the case as a result. For this reason, New York's savings statute – cited by Foster – is irrelevant.

Nonetheless, Foster must be served if this action is to proceed against him. The real issue, not addressed by either side, is whether it is now too late to serve him.

Fed. R. Civ. P. 4(m) requires that service of a summons be effected within 120 days after the filing of the complaint. That period ran long ago. Indeed, we are now more than 120 days beyond the date of the transfer.

However, the same rule permits a court to extend the time for service for an appropriate period if plaintiff shows good cause. Given the purposes of the transfer statute, I conclude that any plaintiff who entertained an honest and principled belief that the transferor court had jurisdiction, based on non-frivolous arguments, would meet Rule 4(m)'s "good cause" standard if he failed to re-serve promptly upon transfer and it later turned out that jurisdiction did not attach in the transferor district. This is consistent with the United States Supreme Court's assertion, in Goldlawr, that transfer is proper, where, as here,

> dismissal. . . would . . . result[] in plaintiff's losing a substantial part of its cause of action under the statute of limitations merely because it made a mistake in thinking that [defendants] could be 'found' or that they 'transact . . . business' in the [transferor] District. . .

369 U.S. at 466.

As noted above, in the early cases that discussed the interplay among jurisdiction, limitations and transfer, plaintiffs routinely re-served the defendants upon transfer. Here, Hatfill

did not attempt to re-serve upon transfer, no doubt because he believed that personal jurisdiction attached while the lawsuit was pending in Virginia. While plaintiff did not prevail in his arguments in favor of Virginia jurisdiction, those arguments were neither frivolous nor interposed for an invalid purpose. I am, therefore, prepared to give plaintiff 30 days to effect service on Foster, so that this action can proceed. If plaintiff fails to effect service within that period, I will dismiss this action pursuant to Rule 4(m).

## Choice of Law

All parties agreed that, if Foster was not amenable to jurisdiction in Virginia, the law of the transferee forum (i.e., New York), including its choice of law rules, would govern the disposition of the claims against him. I will explore the implications of that if and when Foster is re-served.

Both Conde Nast and Reader's Digest argue that New York law should apply to them, even though the law of the transferor court (Virginia) controls for choice of law purposes. Hatfill vociferously disagrees, and argues that Virginia libel law governs his claims against the two publishers.

In this instance, Hatfill prevails.

The basic principles are clear. A federal court sitting in diversity must apply the law of the state in which it sits, except when a case is transferred on the motion of defendants. If the case is so transferred (as this one was), then the transferee court must apply the law that would have been applied by the transferor court.[10]

---

[10] Since Foster joined the other defendants' motions, one might think the rules stated above apply to him. However, Foster specifically stated that he was joining the transfer motion only if the Virginia court had jurisdiction over him. As plaintiff undoubtedly recognizes, this

22

Virginia applies the rule of *lex loci delicti*, or the law of the place where the wrong occurred, to claims of libel, and indeed, to all tort claims. Jones v. R.S. Jones & Associates, 431 S.E.2d 33, 34 (Va. 1993); Milton v. IIT Research Institute, 138 F.3d 519, 521 (4th Cir. 1998); Lapkoff v. Wilks, 969 F.2d 78, 81 (4th Cir. 1992). The law is set forth in the Restatement (First) of Conflict of Laws § 377, which provides, "The place of the wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place."

In defamation suits, the place of harm is the location where the defamatory statement was published, i.e., where it was seen or heard by other parties. Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 915 n.5 (E.D. Va. 2004); St. Clair v. Righter, 250 F. Supp. 148, 150 (W.D. Va. 1966) (cited in Wells v. Liddy, 186 F.3d 505, 522 (4th Cir. 1999)).  Where, as here, an alleged libel is published throughout the nation, including in the forum state, one result in jurisdictions following the *lex loci delicti* approach is application of the forum law.  See, e.g., James R. Pielemeier, Constitutional Limitations on Choice of Law: The Special Case of Multistate Defamation, 133 U. Pa. L Rev. 381, 394 (1985) (noting that "[f]requently, courts have simply applied the law of the forum without extensive analysis" in multistate defamation cases) (cited in Wells, 186 F.3d at 522 (applying Virginia law where publication of the speech at issue occurred *solely* in Virginia, even though the case was filed in the District of Maryland)).  It thus appears that a Virginia court, sitting in diversity and faced with a libel claim, would apply Virginia law as long as the allegedly defamatory statement was published in Virginia – even if it was published elsewhere as well.

Defendants argue that Virginia's *lex loci delicti* approach is inappropriate in multistate

caveat preserves Foster's claim to application of New York law.

defamation cases, and argues instead for the adoption of the approach of the Restatement (Second) of Conflict of Laws § 150, which calls for application of "the local law of the state which . . . has the most significant relationship to the occurrence and the parties." This test is commonly referred to as the "center of gravity" test. New York uses the center of gravity test, and so I will employ center of gravity analysis to the claims against Foster if he is re-served.[11]

The problem with applying the same principle to defendants Conde Nast and Reader's Digest[12] is that the Virginia Supreme Court has steadfastly refused to waver from its adherence to *lex loci delicti*, even in cases of multistate torts. See Jones, *supra*, 431 S.E.2d at 34; McMillan v. McMillan, 253 D.E.2d 662, 663-64 (Va. 1979). Virginia simply has no interest in a center of gravity approach to tort law.  It rejected this approach in McMillan, and fifteen years later, in Jones (decided after many other states had adopted the more "modern" approach) it rejected center of gravity again. I have found no case, and defendants have cited none, suggesting that the Virginia Supreme Court would be inclined to revisit its recent rulings on this subject. While McMillan and Jones are not libel cases, Virginia's steadfast adherence to the traditional rule, and the reasons it gives for refusing to budge from that rule, strongly suggest that the nature of the tort would make no difference to that court's analysis.

The case that defendants cite for the proposition that I should apply the center of gravity test is Wells, *supra*, 186 F.3d 505. The problem with Wells is that it is not a Virginia case. It is a Maryland case. And in Maryland, unlike Virginia, the Court of Appeals "has indicated its

---

[11] This result is dictated by the fact that, as discussed above, the Virginia court lacked personal jurisdiction over Foster, who now likely will be served in New York.

[12] Unlike Foster, these defendants were subject to Virginia jurisdiction, and thus Virginia law applies.

willingness to apply more flexible choice-of-law rules from the Second Restatement in situations when the First Restatement rules have become unworkable." Id., 186 F. 3d at 528. So, for example, Maryland's highest court has moved away from *lex loci delicti* and toward a center of gravity test in the field of workers' compensation. Id. No such movement can be detected in Virginia's high court; to the contrary, it adheres firmly to the traditional standard.

Having no reason to believe that the Supreme Court of Virginia would not adhere to the *lex loci delicti* rule in deciding which state's law applies, I can state with confidence that it would not apply New York law, as Conde Nast argues. Plaintiff has no contacts with New York, so even though <u>Vanity Fair</u> and <u>Reader's Digest</u> are published here, and enjoy considerable circulation here, for *lex loci* purposes New York is no more significant than Pennsylvania or California.

Reader's Digest poses a more interesting question. It argues that the law of the District of Columbia, Hatfill's place of residence when the article was published (and today) should apply, because that is where the impact of the defamation is particularly felt.

As Reader's Digest points out, when a person claims to have been defamed in a multi-state communication, the law of the state of his domicile will generally apply, because that is usually where the impact of the defamation is most significantly felt. Restatement (Second) of Conflict of Laws § 150(2). However, that is at best a rebuttable presumption. Comment (e) to § 150 of the Restatement (Second) notes that a state other than the state of domicile "may be that of most significant relationship if it is the state where the defamatory communication caused plaintiff the greatest injury to his reputation." Hatfill argues that Virginia is the place where he suffered the greatest harm from the article because it is the center of his career, his professional

25

field and his past and future life. The District of Columbia, he urges, is simply a place where he is temporarily hanging his hat.

I need not decide whether the Supreme Court of Virginia would simply apply the law of the forum state in this multistate libel case, or whether it would engage in a "most significant relationship" analysis to determine where the greatest harm to plaintiff occurred. As noted above, this motion has been submitted to me on papers, so I must draw all factual inferences in favor of plaintiff. I have already explained why plaintiff prevails on his argument that he felt the "brunt" of the impact from the articles in Virginia rather than in Washington D.C. While plaintiff's contention about the locus of the biodefense industry has been undermined (though only by Foster, not by Reader's Digest), no defendant has demonstrated that biodefense work is performed to any great degree in the District of Columbia, where Hatfill lives. (Maryland, for choice of law purposes, drops out of the picture). Additionally, Hatfill's many continuing ties to Virginia (mailing address, telephone listing, voter registration, driver's license) contrast with his conspicuous lack of permanent contacts with Washington D.C.

So had Judge Brinkema kept this case, I conclude that she would have applied Virginia law to Hatfill's claims against Conde Nast and Reader's Digest, under either a "law of the forum" or "most significant contacts" interpretation of the *lex loci delicti* rule.

**Further Proceedings**

Proof of service of Foster should be filed with the Clerk of the Court (within 30 days of the date of this decision), and the Court should be notified immediately after service is effected. I

**Further Proceedings**

Proof of service of Foster should be filed with the Clerk of the Court (within 30 days of the date of this decision), and the Court should be notified immediately after service is effected. I will then decide the Rule 12(b)(6) motions.

This constitutes the decision and order of the Court.


Dated: May 23, 2005

_____
U.S.D.J.


BY FAX TO ALL COUNSEL