UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

STEVEN HATFILL,

        Plaintiff,

     -against-                        04 Civ. 9577 (CM)(GAY)

DONALD FOSTER, et al.,

        Defendants.


————————————————————————x


DECISION AND ORDER DECIDING CHOICE OF LAW AS TO FOSTER, AND GRANTING
IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

     The circumstances giving rise to this libel suit and its transfer to this Court are described

more fully in my decision of May 23, 2005, Hatfill v. Foster, 372 F. Supp. 2d 725 (S.D.N.Y.

2005) ("Hatfill I"), familiarity with which is presumed.

     Briefly, defendant Donald W. Foster, Ph.D., is the author of an article entitled, "The

Message in the Anthrax," which appeared in the October 2003 issue of Vanity Fair, a magazine

published by defendant Conde Nast Publications ("CNP"). The article was later republished

under the title, "Tracking the Anthrax Killer," in the December 2003 issue of Reader's Digest,

published by defendant The Reader's Digest Association, Inc. ("RDA"). Foster, a professor of

English at Vassar College and a specialist in literary forensics, wrote in the articles that the FBI

should be concentrating its search for the perpetrator of the post-9/11 anthrax attacks on plaintiff.

The details of these articles are discussed more fully below.

     Plaintiff Steven J. Hatfill, a medical doctor and researcher in the field of hematology and

emerging viral diseases, sues defendants for defamation, intentional infliction of emotional

distress and injurious falsehood – commercial disparagement, claiming, among other things, that Foster's articles contained numerous false statements and "accused Hatfill of the anthrax murders by implication." (Cmplt. ¶¶ 17-20.) Defendants CNP and RDA move to dismiss the action for failure to state a claim against them under Federal Rule of Civil Procedure 12(b)(6). Defendant Foster moves to dismiss some of the claims asserted against him – specifically those relating to the articles published by the other two defendants.

In Hatfill I, I held that Virginia law applies to the claims against defendants CNP and RDA. 372 F. Supp. 2d at 730. The choice of law as to those defendants – who were properly served in Virginia before the case was transferred here – is governed by Virginia's *lex loci delicti* rule, and the *locus* of the *delictus* in this case (at least as pleaded by plaintiff) is Virginia. See id.

In that same opinion, I concluded that the court in which this action was originally commenced lacked personal jurisdiction over Foster. However, I ruled that the claim against him was not time-barred and could be properly brought in this Court, as long as he was served with process promptly. I did not at that time decide what law applied to the claims against Foster, but ruled that New York's choice-of-law rules would be applied whenever I did make that determination.

Foster, through his counsel, has waived service of process. (See Letter from K. Goering to Hon. C. McMahon, dated June 2, 2005). He is, therefore, properly before this Court.

I am now deciding the rest of the motions that were transferred to this Court from the Eastern District of Virginia. For the reasons that follow I hold that: (1) Virginia law applies to the claims asserted against Foster; and (2) the defendants' motions to dismiss should be granted

only to the extent of dismissing Hatfill's claims against all defendants for injurious falsehood. The motions to dismiss are otherwise denied.

## I.    Choice of Law: Virginia Law Governs the Claims Against Foster

"The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993). The libel laws of New York and Virginia are not identical. New York law, for example, offers significantly more protection to statements of opinion than does Virginia law. Since Foster claims that New York law should govern the claims against him, a choice of law question exists.

In determining choice of law issues in a tort case, New York courts have moved away from the traditional *lex loci delicti* rule followed by Virginia. New York instead applies a "center of gravity" test. See Schultz v. Boy Scouts of Am., 65 N.Y.2d 189, 195, 491 N.Y.S.2d 90, 94 (1985). Under the "center of gravity" test, a court should apply the law of the jurisdiction "having the greatest interest in the litigation." 19A N.Y. Juris. 2d., Conflict of Laws § 53 (2005).

In deciding what state has the greatest interest in a lawsuit, New York courts distinguish between claims involving loss allocation and those governing conduct. Contacts between the parties and their domiciles factor more heavily in cases governed by loss allocation rules, while "...the law of the place of the tort will usually have a predominant, if not exclusive, concern" in conduct-regulating cases.  Padula v. Lilarn Prop. Corp., 84 N.Y.2d 519, 522, 620 N.Y.S.2d 310, 311 (1994) (internal quotation marks omitted). The laws defining libel and the defenses thereto are conduct-regulating. Therefore, in defamation cases, "The significant contacts are, almost

exclusively, the parties' domiciles and the locus of the tort." Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999) (internal quotations omitted).

In a libel case, the law of the plaintiff's domicile at the time of the tort will usually apply, "...assuming that the defamation was published in the plaintiff's state, because plaintiff's home state is where a plaintiff's reputation is most likely damaged." La Luna Enters., Inc. v. CBS Corp., 74 F. Supp. 2d 384, 388 (S.D.N.Y. 1999). But if the plaintiff "... has a significant relationship to a state other than the state of his domicile," New York does not automatically apply the law of the plaintiff's domicile. Rudin v. Dow Jones & Co., 510 F. Supp. 210, 216 (S.D.N.Y. 1981). While the defendant's domicile is not irrelevant, a survey of recent libel cases between out-of-state plaintiffs and New York defendants involving multi-state or nationwide publications indicates a marginal preference for the law of the plaintiff's domicile, at least where there is no other reason to apply New York law. Compare, e.g., Condit v. Dunne, 317 F. Supp. 2d 344, 355 (S.D.N.Y. 2004) (applying law of the plaintiff's domicile); Lee, 166 F.3d at 546 (same); La Luna, 74 F. Supp. 2d at 388 (same); Machleder v. Diaz, 801 F.2d 46, 52 (2d Cir. 1986) (same); with Jewell v. NYP Holdings Inc., 23 F. Supp. 2d 348, 360 (S.D.N.Y. 1998) (applying law of defendant's domicile, i.e., New York); Levin v. McPhee, 917 F. Supp. 230, 236 (S.D.N.Y. 1996) (same); Davis, 580 F. Supp. at 1086 (same). In those cases where defendant's domicile trumped plaintiff's, New York had some other significant connection to the case, making use of its law reasonable. See Levin 917 F. Supp. at 236 (New York was the site of the first publication); Davis, 580 F. Supp. at 236 (New York contract concerning republication was highly relevant to the case).

Here, I have already found (his allegation of citizenship in the complaint notwithstanding) that Hatfill's domicile is Virginia.  Domicile is created by a "union of residence and intention."  In re Newcomb's Estate, 84 N.E. 950, 954 (N.Y. Ct. App. 1908). Hatfill was apparently a resident of Maryland or Virginia between 1998 and 2003. Although he resides in Washington D.C. at present, plaintiff maintains the usual indicia of domicile (driver's license, voter registration, etc.) in Virginia. See Hatfill I, 372 F. Supp. 2d. at 741. He also expresses a desire to return to Virginia. Pl.'s Decl. ¶ 10.

Foster is a New York domiciliary. However, in this case, it is a virtual certainty that New York would apply Virginia's law rather than its own, despite Foster's domicile, if only because New York strongly favors applying a single state's law to cover a single incident of libel.  See Mattox v. News Syndicate Corp., 176 F.2d 897, 900 (2d Cir. 1947),  Palmisano v. News Syndicate Co., 130 F. Supp. 17, 19 n.1 (S.D.N.Y. 1955); cf. Simon v. Philip Morris Inc., 124 F. Supp. 2d 46, 78 (E.D.N.Y. 2000) (applying one state's law in mass-tort context). Virginia law indisputably applies to the claims against the other two defendants, see Hatfill I, 372 F. Supp. 2d at 741, so absent some compelling interest, New York would not ordinarily apply its law to just one of three defendants in the same case.

Foster argues that there is such a compelling interest, because New York law is strongly protective of publishers as the "national center of the publishing industry." Davis, 580 F. Supp. at 1092. But Foster is not a publisher; he is an author. And where, as here, the publisher's conduct is governed by the law of another state, New York should have little or no interest in applying its law to the conduct of an author. Absent publication, there is no defamation. To apply New York's libel laws to the author (who could not defame if he did not publish) while

applying Virginia's law to the publishers (the actual agents of the alleged defamation) makes absolutely no sense.

I would stop here, but in their briefs, the parties discuss a "nine-factor" test, first set forth in <u>Palmisano</u>, 13 F. Supp. at 19 n.2, as a possible method of determining which state's law applies under the center of gravity test. These nine factors are:

> (1) the state of plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where plaintiff in fact suffered the greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where defendant's main publishing office is located; (6) the state of principal circulation; (7) the place of emanation; (8) the state where the libel was first seen; and (9) the law of the forum.

<u>Id.</u> These nine factors are not to be given equal weight, but must be considered according to their relative importance. <u>See</u> <u>Davis</u>, 580 F. Supp. at 1092.

The nine-factor test has been limited in recent decisions. <u>See</u> <u>Condit</u>, 317 F. Supp. 2d at 354, n.2 (using the test as a guideline rather than a rule); <u>Lee</u>, 166 F.3d at 545 ("this test applies, *if at all*, only in cases of multi-state publication") (Emphasis added). But its application results in the same answer – Virginia law applies.

Plaintiff's domicile is Virginia. Plaintiff has asserted, and for purposes of this and the prior motion this court has found, that Virginia is the center of the bio-defense industry, and that his personal and professional contacts existed there. Virginia was also the site of the Plaintiff's most significant period of employment – at Science Applications International Corp. (SAIC) in McLean, Virginia – and contains a significant number of private and government-sponsored research facilities for biotechnology. See <u>Hatfill I</u>, 372 F. Supp. 2d. at 741. Therefore, it is both

the state of plaintiff's principal activity to which the alleged defamation relates and, as I found previously, the state where plaintiff suffered the greatest harm. Id.

Among the nine factors, defendant's domicile and the law of the forum favor New York. But in a defamation case, the usual rule is that the plaintiff's domicile trumps defendant's when the defamatory statement was published in the plaintiff's home state. In this case, the allegedly defamatory statement was published in plaintiff's home state (as well, of course, as every other state).

So the factors favoring application of New York law are outweighed by the factors enumerated above, which favor Virginia.   The remaining factors have little weight in this case, because they relate solely to the conduct of publishers, not to that of authors like Foster.

I thus conclude, under any arguably applicable test, that Virginia law governs the claims against Foster.

## II.     Standard for Motion to Dismiss

A court may grant a Rule 12(b)(6) motion to dismiss for failure to state a claim only "when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Phillip v. Univ. of Rochester, 316 F.3d 291, 293 (2d Cir. 2003) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); Kaltman-Glasel v. Dooley, 156 F. Supp. 2d 225, 226 (D. Conn. 2001).

The function of the court is not to weigh the evidence that may be presented at trial. Instead, the court must determine if the claims are legally sufficient. See Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985); see also King v. Simpson, 189 F.3d 284, 287 (2d Cir. 1999). The court must construe all reasonable inferences in favor of the plaintiff and accept the

allegations contained in the claims as true. <u>See</u> <u>Desiderio v. Nat. Ass'n of Sec. Dealers, Inc.</u>, 191 F.3d 198, 202 (2d Cir. 1999). Therefore, a court must evaluate whether the allegations in the complaint can sustain a cause of action under applicable law, and should grant the motion to dismiss only if the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. <u>See</u> <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002); <u>King</u>, 189 F.3d at 286. The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims. <u>Villager Pond, Inc. v. Town of Darien</u>, 56 F.3d 375, 378 (2d Cir. 1995).

Under Fed. R. Civ. P. 8, a plaintiff must articulate only a short, plain statement explaining why he is entitled to relief. In a case brought against <u>The New York Times</u> by Hatfill for publishing a series of allegedly defamatory articles, the Fourth Circuit recently held that a claim for defamation is not subject to any heightened pleading standard, and that it is error to use "particular care" when evaluating the sufficiency of a defamation complaint under Rule 12(b)(6). <u>Hatfill v. N.Y. Times Co.</u>, 416 F.3d 320, 329 (4th Cir. 2005) (<u>rehearing en banc denied</u>, October 18, 2005) ("<u>Hatfill II</u>"). For purposes of deciding a motion to dismiss, a court is to assume that the allegedly defamatory allegations are indeed false. <u>Id.</u>

However, whether a publication can be read to be libelous presents in the first instance a question of law for the court. If, assuming the statement to be true, no reasonable trier of fact could possibly conclude that the statement was capable of defamatory meaning, the claim must be dismissed. For this reason, the text of an alleged libel is properly placed before the court on a motion to dismiss where, as here, the defendants argue that the articles in question cannot possibly be read to be libelous.

**III.    Plaintiff Has Stated a Claim for Libel**

*A. The Law of Libel in Virginia: Relevant Standards*

Generally, a plaintiff claiming libel must allege that defendant (I) published to a third party (ii) a false and defamatory statement; (iii) which was "of and concerning" the plaintiff; (iv) with the requisite degree of fault – the degree of which depends on the status of the libeled party and the subject matter of the statement; and (v) special harm or *per se* actionability. See Chapin v. Greve, 767 F. Supp. 557, 562 (E.D. Va. 1992).

Under Virginia law, the following types of statements are actionable as defamation *per se*:

> (1) statements that impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished, (2) statements that impute that a person is infected with some contagious disease, where, if the charge is true, it would exclude the party from society, (3) statements that impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of duties of such an office or employment, and (4) statements that prejudice such person in his or her profession or trade.

Hatfill II, 416 F.3d at 330 (internal quotation marks omitted) (quoting Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 82 S.E.2d 588, 591 (1954)).  "[I]t is not necessary that the defamation charge be in direct terms, but it may be made indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory." Carwile, 82 S.E.2d at 592.

As long as the articles that appeared in Vanity Fair and Reader's Digest are capable of being read as imputing to the defendant the commission of a crime, or imputing that he is unfit to perform the duties of his office or employment, or prejudicing him in his trade of professions, the complaint – which points to literally dozens of alleged falsehoods and defamatory

implications contained in the piece – more than adequately pleads its claims in accordance with the standards of Rule 8. I turn, then, to the real question raised by the defendants' Rule 12(b)(6) motion to dismiss – whether the articles in suit are capable of defamatory meaning. I conclude that they are.

As noted above, whether a publication is capable of defamatory meaning presents a question of law for the court. Yeagle v. Collegiate Times, 255 Va. 293, 497 S.E.2d 136, 138 (1998); Hatfill II, 416 F.3d at 334. A court must ascertain the reasonable meaning of the article by applying the plain and ordinary meanings of the words used and considering the article as a whole and its context. See, e.g., Wells v. Liddy, 186 F.3d 505, 523 (4th Cir. 1999).

Virginia recognizes certain defenses to libel that will be apparent from the face of the allegedly libelous publication and can thus be raised on a motion to dismiss.

**Defenses: Defamatory Intent**. If a court determines that an allegedly defamatory implication reasonably is conveyed by the article in question, the court must then assess whether the words used support the conclusion that the defamatory implication was intended by the publisher. See, e.g., Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir. 1993). In Virginia, however, if a plaintiff also challenges defendants' underlying "factual" assertions, it is not necessary to show that the defamatory implication was intended. See, e.g., Hatfill II, 416 F.3d at 334 n.7. Conde Nast argues that other jurisdictions, including New York, have not recognized this exception and require proof of intent from the face of the article. (Letter from D. Schulz to Hon. C. McMahon, dated August 8, 2005 (citing Chaiken v. VV Publ'g Corp., 907 F. Supp. 689, 698 (S.D.N.Y. 1995), aff'd, 119 F.3d 1018 (2d Cir. 1997)). But Chaiken applies New York law, which is not the law that governs in this action. As will be seen below, I conclude that

the complaint more than adequately *alleges* fact tending to show that the defamatory implication was intended, by both the author and the two publishers. *Proof*, as opposed to *allegation*, is a matter for another day.

**Defenses: Report of Official Government Action**. As a matter of constitutional law, the news media is privileged to report to the public fair and accurate accounts of official actions and actions of the government, even when those actions are based on information that ultimately proves to be false. See, e.g., Reuber v. Food Chem. News, Inc., 925 F.2d 703, 712 (4th Cir.), cert. denied, 501 U.S. 1212 (1991). However, as discussed below, a reasonable reader could conclude that neither article at issue in this proceeding qualifies as a "report" of an official investigation. In fact, only an unreasonable reader would conclude that the articles were merely reports about an official investigation.

**Defenses: Accurate Report of Charges of Wrongdoing**. Similarly, accurate reports of charges of wrongdoing are not actionable. See, e.g., Miller v. News Syndicate Co., Inc., 445 F.2d 356, 357-58 (2d Cir. 1971) (newspaper not liable for describing arrest of plaintiff for alleged participation in heroin smuggling ring); Green v. CBS, Inc., 286 F.3d 281, 285 (5th Cir. 2002) (no claim for libel based on accurate report of allegation of child abuse); Janklow v. Newsweek, Inc., 759 F.2d 644, 648-49 (8th Cir. 1985) (report of girl's allegation of rape is not capable of defamatory meaning that plaintiff actually committed rape); Basilius v. Honolulu Publ'g Co., 711 F. Supp. 548, 551-52 (D. Haw. 1989) (no libel claim based on accurate report that plaintiff was accused in anonymous letter of role in assassination of politician), aff'd 888 F.2d 1394 (9th Cir. 1989). However, since Hatfill has not been charged with any crime, the articles in suit cannot be described as accurate reports of *charges of wrongdoing*.

**Defenses: Opinion**. Finally, while the United States Supreme Court has declined to recognize a "...wholesale defamation exemption for anything that might be labeled 'opinion,'" it has instructed that statements of opinion are entitled to "full constitutional protection" unless they can reasonably be interpreted to state or imply untrue facts. Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19 (1990). The Milkovich Court explained that "expressions of opinion" may be actionable if they "imply an assertion of objective fact":

> If a speaker says, "In my opinion, John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

Id. at 18-19. Generally, statements of opinion must carry a "provably false factual connotation to be actionable." Id. at 20 (discussing Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986)).

Whether a challenged statement is one of fact or opinion is a question of law for the court under Virginia law. Levin, 119 F.3d at 196; Lapkoff v. Wilks, 969 F.2d 78, 81-83 (4th Cir. 1992). In Virginia, which hews close to the line drawn by Milkovich and Hepps, only "pure" expressions of opinion are protected. Williams v. Garraghty, 445 S.E.2d 209, 215 (Va. 1995); accord Fuste v. Riverside Healthcare Ass'n, 575 S.E.2d 858, 861 (Va. 2003) ("Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion."); WJLA-TV v. Levin, 564 S.E.2d 383, 393 (Va. 2002) (if allegations are presented as fact, then they fall outside the realm of protected opinion). In keeping with Virginia's particularly attentive stance toward allegations of professional unfitness, statements that medical

-12-

doctors "abandoned" their patients, or that there were "concerns about their competence," have been held to be "demonstrably true or false" and are therefore actionable. Fuste, 575 S.E.2d at 861-62.

With these principles in mind, I turn to the articles in suit.

*B. The Vanity Fair Article: "The Message in the Anthrax"*

1. "The Message in the Anthrax" is capable of a defamatory meaning.

The first question to be addressed is whether the Foster article that appeared in Vanity Fair is capable of being fairly read to have a defamatory meaning. The answer is yes. The article can be read to impute the commission of the anthrax murders to Hatfill. It can also be read to assert that Hatfill is unfit to have the security clearance necessary to work in his chosen profession. Either is libelous *per se*.

*(i) The Article "The Message in the Anthrax": A Summary*

"The Message in the Anthrax" opens dramatically, with the story of an American scientist – a "biowarrior" named William C. Patrick – who had been sounding the alarm about bioterrorism for years. In 1999, Patrick predicted that there would be a bioterror attack, using a sophisticated agent manufactured overseas, within two years. Donald Foster, "The Message in the Anthrax," Vanity Fair, Oct. 2003 at 182 (hereinafter, "VF"). Patrick's prediction came true, Foster states, when people in various parts of the country began to sicken and die from anthrax poisoning after anonymous letters showed up in locations from New York to Florida. This occurred less than a month after the 9/11 terrorist attacks on New York City. Id.

Foster theorized that the anthrax murders were the work of a scientist who was frustrated by the governmental and public indifference to prior warnings about the country's vulnerability

to biological or chemical attacks. Foster believed this scientist decided that the American people were finally ready, in the immediate aftermath of 9/11, to hear and heed the alarm that Patrick and others had been sounding for many years. He conjectured that the anthrax letters, which so terrorized the nation during the autumn of 2001, were mailed to send America that message. This mysterious scientist also hoped, as a by-product of getting the word out, that "America's leading biowarriors will receive the kind of recognition and respect they have long deserved." VF at 186.

Foster came up with these theories and conjectures, not in his role as a Vassar professor, but in his second life as a crime fighter. Early in the article, Foster explains that he lives a double life reminiscent of Indiana Jones. In his academic life, Foster uses a technique known as "literary forensics" to attribute authorship to anonymous ancient works. Between teaching assignments, he applies the same methods to documents in criminal cases. VF at 182. Using his "literary forensics," Foster has analyzed documents in connection with several high-profile criminal investigations, including the Unabomber case, the Jon-Benet Ramsey murder, the bombing at Centennial Olympic Park in Atlanta, and the "Army of God" bombings. Id. He also identified Newsweek columnist Joe Klein as the author of the book Primary Colors. Id.

Having thus established his credentials, Foster reveals that he was contacted by the FBI shortly after the first news about deaths relating to anthrax mailings. Id. The article chronicles the investigation that he (Foster) carried out – mostly on his own and not in response to any request by the Government – to try to figure out who the author of the anthrax letters might be. He stated, straightforwardly, that he had "decided to speak out" about his findings because "many of the questioned documents pertinent to the anthrax case have been zero-filed" – i.e., put

in the back of a file drawer and ignored. "More information has been gleaned from those brief letters than you may suppose," Foster wrote. <u>VF</u> at 182.

Foster's analysis suggested that, although the anthrax missives contained such terrorist sloganeering as "death to america/death to israel," the sender of the lethal letters was an American, not a foreigner. He discerned this by observing that the writer (i) made clumsy attempts to disguise himself as Russian by using (and misusing) Cyrillic letters and misspelling English words, <u>VF</u> at 185; (ii) dated his letters in the American style – MM/DD/YY – rather than using the DD/MM/YY convention employed everywhere else in the world (including, of course, Russia), <u>id.</u>; and (iii) appeared to be familiar with New Jersey. <u>Id.</u>

Certain other clues  –  a few of which were "literary" but most of which were not – suggested to Foster that the perpetrator was a scientist who worked in the field of bioterrorism. These clues included the facts that: (i) the anthrax used was extremely fine grade (described at one point as "weapons grade"and at another as "weaponized"), <u>VF</u> at 185-86; (ii) very few "experts" in the United States were capable of producing such anthrax, <u>VF</u> at 196; (iii) the anthrax sent to several congressional offices was Ames strain anthrax – a strain of anthrax used in the U.S. biodefense program whose distribution was regulated by the United States Army Medical Research Institute for Infectious Diseases (USAMRIID) and limited to "about a dozen labs under tight security controls...," <u>VF</u> at 185; and (iv) the name of one of the victims, Howard Troxler, had been misspelled as "Toxler" in the letter sent to him (which Foster theorizes was a "reflexive misspelling by someone used to writing such words as 'toxic,' 'toxicity,' 'toxins,' 'toxicology,''toxoid'"). <u>Id.</u> Foster calls the idea that a scientist might be involved in the anthrax mailings "my hypothesis." <u>VF</u> at 186.

Foster further hypothesized that the mysterious scientist was not trying to kill people, but to warn them. Id. He so concluded because all the notes were enclosed in well-taped envelopes, and that they warned the recipient to seek immediate treatment with an antibiotic. Id.

Foster initially refers to this mysterious Paul Revere of bio-terrorism as "John Doe." Id. But most of his article demonstrates why John Doe's real name is Steven Hatfill.

Hatfill's name first appears in the article when Foster discussed a conference held in Swindon, England at which "some of the West's top biowarriors" were being trained and certified "to join the search for Saddam's bioweapons in Iraq." VF at 187. Hatfill attended the conference. Plaintiff is described by Foster as "a protege of Bill Patrick's," "a former USAMRIID virologist," and a "big name" in the biodefense field. Id. Foster also described his subject as "a concept man with a detailed vision for building mobile germ labs." VF at 188.

Immediately after noting Hatfill's presence in England for the conference, Foster points to the following coincidence, "While the 12-day course was underway, someone sent....[a] biothreat letter [containing a nontoxic powder], postmarked in November in London, to Senator Daschle." Id.

Foster goes on to chronicle a string of similar coincidences involving Hatfill and varoius bioterror threats and hoaxes. While looking at pre-2001 bio-hoaxes to see if he could connect them to the anthrax mailings, Foster "uncovered a trail of seemingly related biothreat incidents, several of which exhibited language and writing strategies similar to those of the New Jersey and Florida documents." VF at 188. The thing that tied all these incidents together for Foster is that he could connect Hatfill in some way to each one of them.

One such incident occurred in April 1997, when someone sent a petri dish containing

Bacillus cereus, an anthrax stimulant used in biodefense research, to the headquarters of B'nai B'rith in Washington, D.C. <u>VF</u> at 190. Foster learned that Hatfill, then a virolgist on the staff of the National Institutes of Health, had been in Washington D.C. on the day of the B'nai B'rith incident, auditing a seminar on bioterrorism. Hatfill wrote to the seminar's organizer, observing that the attack demonstrated how vital the topic was to the security of the United States. <u>Id.</u> He also gave an interview to the <u>Washington Times</u> about biological attacks shortly after the B'nai B'rith incident. <u>Id.</u>

Several months before the B'nai Brith incident, unidentified gasses had incapacitated passengers at both BWI and Washington National Airports. <u>VF</u> at 190. Such gas incidents continued throughout the year. When Hatfill gave a second interview about bioterrorism to the <u>Times</u> (this time for *Insight*, the paper's weekly magazine section), he said, "These types of incidents could be a form of testing for a possible future terrorist attack – perhaps next time using anthrax." <u>Id.</u> Foster went on to observe, "[Hatfill's]s ominous commentary was accompanied by a photograph of Hatfill at home, in his kitchen, wearing garbage bags, gloves, and an army-supply gas mask, illustrating how a bioterrorist might cook up bubonic plague in a private laboratory and cause havoc using a homemade spray disseminator such as the one Hatfill had designed himself." <u>Id.</u> This seemed to Foster "an unusual hobby" for a virologist employed by National Institutes of Health. <u>Id.</u>

The *Insight* article mentioned that Hatfill had been working in Zimbabwe (then known as Rhodesia) in the late 1970s, where he witnessed a serious anthrax outbreak. Although the outbreak was described at the time as "natural," some people (Foster specifically identified the authors Dr. Meryl Nass and Jeremy Brickhill) suspected that it was actually a biowarfare attack

perpetrated by Rhodesia's government-backed militia, the Selous Scouts. Id. Foster located a brief autobiography in which Hatfill had stated that he had earned his medical degree from a school in Rhodesia and had served in the late 1970s with this very militia in that very country. Id.

Having identified some purportedly coincidental association between Hatfill and other bioterror hoaxes or incidents, Foster states, "Steven Hatfill was now looking to me like a suspect....When I lined up Hatfill's known movements with the postmark locations of reported biothreats, those hoax anthrax attacks appeared to trail him like a vapor cloud." VF at 190. This "vapor cloud" included not only the incidents cited above, but at least three others:

(1) Hatfill worked at USAMRIID, an agency where, "The army for the past decade has conducted extensive biodefense research on weaponized materials." VF at 186.

(2) As part of his job, Hatfill created a scenario for a biowarfare attack that eerily came true only days before Hatfill was due to attend a conference on antiterrorism:

> Biowarfare fiction was no mere lark for Steven Hatfill. It was his speciality. His responsibilities at USAMRIID included the writing of bioterror scenarios, at least one of which actually happened. Hatfill envisioned someone spreading a pathogen throughout several floors of a public building. It would take only one reported illness, he predicted, "to shut down the entire building, especially if the bug had been sprayed on several floors. Then the call comes: 'Let our man loose, or we'll do a school.'" In August 1998, in Wichita, Kansas, 40 miles southeast of Southwestern College, Hatfill's alma mater, powder was spread throughout several floors of the Finney State Office Building. Then came "the call" in the forms of a letter from a team of Christian Identity extremists and a group calling itself Brothers for Freedom of Americans.
>
> A few days later, Hatfill and Bill Patrick arrived in San Diego for the Worldwide Conference on Antiterrorism...

VF at 196.

(3) Foster wrote that Hatfill moved to a new job in Louisiana in March 2002, the same

month in which "a fresh batch of anthrax letters" were mailed from Louisiana. VF at 195.

Hatfill's stint in Rhodesia yielded another "literary" clue. The anthrax-laden letter sent to Senator Tom Daschle's chambers in Washington bore a return address from the "fourth grade" at a "Greendale School." VF at 186. Foster was unable to locate such a school in New Jersey, from which the Daschle letter was sent. But after learning that Hatfill spent time in Rhodesia, he discovered that there was town of Greendale just outside of Harare, Rhodesia, a mile from the medical school Hatfill attended while serving with the Selous Scouts. VF at 190. Foster writes, "It's not uncommon for writers of criminal threats to draw on their own experience and reading." VF at 186.[1]

Having identified Hatfill as a "suspect" in his own mind – as well as a "person of interest" to the Government – Foster reveals that the FBI first searched Hatfill's home exactly one week after a Dr. Barbara Rosenberg (a scientist who shared Foster's conviction that "the perpetrator of the anthrax crimes was an American microbiologist, probably a government insider with experience in a U.S. military lab," VF at 195.) discussed the evidence "such as it was, hers and mine" with the staff of the Senate Judiciary Committee. VF at 196. According to Foster, the FBI found a cannister of Bacillus thuringiensis in Foster's refrigerator during the search. Bacillus thuringiensis is a mostly harmless pesticide that is widely used on caterpillars, but USAMRIID studied the substance extensively in the mid-1990s, purportedly after learning that it was Iraq's "favored anthrax stimulant." VF at 199.

---

[1] Foster also managed to suggest a tenuous link between Foster and the B'nai B'rith hoax by noting that, in the first interview he gave to the Washington Times, Hatfill made a reference to "Throckmorton Middle School." Foster searched the Internet for such a school revealed "nothing of interest outside Throckmorton, Texas, except for the Throckmorton Plant Sciences Center at Kansas State University, where courses are taught on agricultural plant pathogens." Later in the article, Foster dropped in the otherwise irrelevant information that Hatfill had attended college near Wichita, Kansas. VF at 190.

Shortly after the FBI search, Foster claims to have been "flooded" with information about Hatfill from a variety of sources. Id. In that flood of information was a copy of an unpublished novel written by Hatfill. Entitled Emergence, the book was about "...an Iraqi virologist [who] launches a bioterror attack on behalf of an unnamed sponsor, using an identity acquired from the Irish Republican Army and a homemade sprayer like the one *Steven J*. Hatfill demonstrated for The Washington Times. A fictional scientist named *Steven J*. Roberts comes to the rescue..." Id. (Emphasis added to make the obvious point). Hatfill wrote a surprise ending for his novel – the Russian mob was really responsible for the attack, not Iraq – which permitted the book to add the following coda: "The reaction was as great as we had hoped for – the entire focus of the American FBI has now shifted toward combating chemical/biological terrorism..." Id. Foster's theory, the reader will recall, is that the anthrax killer wanted to get this country to focus on the chemical/biological warfare threat (although not so the Russian mafia could have free rein).

Finally, Foster mentions again and again the link between Hatfill and Bill Patrick. Patrick and Hatfill are coupled throughout the article – Hatfill is identified as Patrick's "protege" and his "sidekick," and the two are described as a "Batman and Robin team." VF at 200. Foster reports on the various conferences the two men attended together and noted that the two conducted training sessions together on virology for Special Forces soldiers. VF at 195.

Foster used this link to suggest that Hatfill could be one of the few people in the United States who had the ability to make the sort of fine dry powder that was sent to Senators Leahy and Daschle. Toward the end of the article, Foster discusses a classified document authored by Patrick, which described how a hypothetical attacker could use the U.S. Mail "to deliver a business envelope containing no more than 2.5 grams of aerosolized anthrax, refined to a trillion

spores per gram, in particles smaller than five microns..." <u>VF</u> at 196. Noting that this "prophecy" was "right on the money" (i.e., it correctly anticipated the letters sent to Senators Daschle and Leahy), Foster says, "Bill Patrick plus the Dugway scientists [the Army biowarfare experts at Dugway Proving Ground in Utah] make up [the] short list of *four* U.S. experts who know how to make such a fine dry powder. The anthrax killer, whoever he may be, *represents a fifth expert with Patrick's bench skills."* <u>Id.</u> (Emphasis added). By insisting that the short list of people who could create find powder anthrax was limited to "four," and identifying the anthrax killer as a "fifth expert," Foster eliminated Patrick and the Dugway scientists – the only people who were known to have the skills needed to create "such fine dry powder" – as possible suspects in the lethal mailings. <u>Id.</u>

Having set out his "evidence" and his "hypotheses," Foster describes on the press conference at which Hatfill –"having shaved off his moustache of 20 years" – dramatically protested his innocence. <u>VF</u> at 199. Foster observes that Hatfill's "emotional display won over many hearts" and led to his being compared with Richard Jewell, the "long-suffering" suspect who was wrongly – and very publicly – suspected of planting the bomb in Atlanta's Centennial Olympic Park. <u>Id.</u> Foster then reaches the climax of his piece:

> I know something about the Centennial Olympic park serial bomber,
> because I helped – using linguistic evidence gleaned from the Army of
> God letters – to direct investigative attention on to Eric Robert Rudolph.
> And it is my opinion, based on the documents I have examined, that
> *Hatfill is no Richard Jewell*.

<u>Id.</u> (Emphasis added)

 A disclaimer quickly follows: "It is not my job to indict or to try my own suspect for the anthrax murders. And even if the FBI should find hard evidence linking Hatfill to a crime, he

will remain innocent until proven guilty," Foster writes. But, "Americans have a right to know more about the system that allowed Steven Hatfill to become one of the nation's leading bioterror experts." <u>VF</u> at 200. Foster calls Hatfill is a liar ("I have three different editions of his curriculum vitae, each one a tissue of lies") and a "rascal," and asks how such a person could have been allowed to acquire "a working knowledge" of many biowarfare secrets and skills, or obtain "clearance to operate in top military labs on exotic viral pathogens, such as Ebola, and on Level 3 pathogens such as bubonic plague and anthrax?" <u>Id.</u>

*(ii) The Article As a Whole is Susceptible to Defamatory Meaning*

The foregoing synopsis of "The Message in the Anthrax" leaves no doubt that the article is capable of defamatory meaning. False allegations of criminal behavior and of unfitness to perform one's job are both libelous *per se*. The article can fairly be read to allege that (1) the evidence showed (at least to Foster's satisfaction) that Hatfill was the anthrax killer; and (2) Hatfill was not fit to hold a job that required clearance or dealt with sensitive biowarfare issues. If untrue, either allegation would be libelous *per se*.

*(iii) The Article Cannot be Read as Simply A Report of the FBI Investigation*

Foster and Conde Nast argue that his article is no more than a report on, and a critique of, the FBI's investigation into the anthrax mailings. It is no such thing.

An identical argument was rejected recently by the United States Court of Appeals in another lawsuit brought by Hatfill, this one against The New York Times Co. arising out of Op-Ed columns written by Nicholas Kristof. In <u>Hatfill v. N.Y. Times Co.</u>, 416 F.3d 320, 329 (4th Cir. 2005) (<u>rehearing en banc denied</u>, October 18, 2005) ("<u>Hatfill II</u>"), the Fourth Circuit ruled that Kristof's columns on the anthrax investigation were capable of defamatory meaning. <u>See</u> <u>id.</u>

at 334. In his columns, Kristof criticized the FBI's handling of information related to a man he referred to as "Mr. Z," claiming that "the bureau's lackadaisical ineptitude in pursuing the anthrax killer continues to threaten America's national security." <u>Id.</u> at 325. "People in the biodefense field first gave Mr. Z's name to the bureau as a suspect in October, and I wrote about him elliptically in a column on May 24. He denies any wrongdoing. . ." In a subsequent column, Kristof wrote, "It's time for me to come clean on 'Mr. Z.' . . . He is Steven J. Hatfill..." <u>Id.</u> at 27.

If Kristof's columns are capable of defamatory meaning under Virginia law (which the Fourth Circuit applied), then so is Foster's <u>Vanity Fair</u> article.

In <u>Hatfill II</u>, the excerpts from Kristof's columns show that, while he was ostensibly criticizing the FBI for its handling of the anthrax investigation, he was in fact naming Hatfill as the person to whom all circumstantial evidence pointed. For example, Kristof offered a series of rhetorical questions to the FBI (with his own responses) concerning Mr. Z. in particular, including the following:

> *Why was [Mr. Z's] top security clearance suspended in August, less than a month before the anthrax attacks began?* This move left him infuriated. Are the C.I.A. and military intelligence agencies cooperating fully with the investigation?. . . *Have you examined whether Mr. Z has connections to the biggest anthrax outbreak among humans ever recorded, the one that sickened more than 10,000 black farmers in Zimbabwe in 1978-80?* There is evidence that the anthrax was released by the white Rhodesian Army fighting against black guerillas, and Mr. Z has claimed that he participated in the white army's much-feared Selous Scouts. . . Mr. Z's resume also claims involvement in the former South African Defense Force; all else aside, who knew that the U.S. Defense Department would pick an American who had served in the armed forces of two white-racist regimes to work in the American biodefense program with some of the world's deadliest germs?

<u>Id.</u> at 326.

The Fourth Circuit rejected The New York Times' argument that this was no more than a

critique of the FBI; it ruled that the articles were actionable as defamatory *per se,* because they

were capable of being read to impute the commission of the anthrax murders to Hatfill:

> The columns did not describe any other actual or potential target of investigation, and they recounted detailed information pertaining to Hatfill alone. Once Kristof named Hatfill as Mr. Z. . . , a reasonable reader of his columns could believe that Hatfill had the motive, means, and opportunity to prepare and send the anthrax letters in the fall of 2001; that he had particular expertise with powder forms of anthrax, the type used in the mailings; that his own anthrax vaccinations were current; that he was the prime suspect of the biodefense community as well as federal investigators; that he had failed numerous polygraph examinations; that specifically trained bloodhounds had 'responded strongly' to Hatfill, his apartment, and his girlfriend's apartment but not to anyone else or any other location; and that Hatfill was probably involved in similar anthrax episodes in recent years. Based on these assertions, a reasonable reader of Kristof's columns likely would conclude that Hatfill was responsible for the anthrax mailings in 2001. . . Notwithstanding Kristof's attribution of certain allegations to unnamed sources, or his caution that readers should entertain a presumption of Hatfill's innocence, or even his statement that the FBI should 'end this unseemly limbo by either exculpating Dr. Hatfill or arresting him,' *the unmistakable theme of Kristof's columns is that the FBI should investigate Hatfill more vigorously because all the evidence (known to Kristof) pointed to him.*

Id. at 333-34 (internal citations omitted) (Emphasis added).

"The Message in the Anthrax" says everything that Kristof wrote about Hatfill and then

some.  The article hypothesizes a suspect in the killings who meets Hatfill's profile; says that

other biowarfare incidents and hoaxes, going back to Africa in 1978,  "followed him around like

a vapor cloud;" suggests that he had developed the skills needed to create the type of anthrax

used in the mailings (a skill possessed, according to Foster, by only a handful or people, one of

whom could be connected to Hatfill); announces that he had biological material in his home

refrigerator; and even implies that he deliberately altered his appearance prior to holding a press

conference to protest his innocence.

All this leads to Foster's climactic comparison between Hatfill and the wrongly accused Richard Jewell – a comparison that Foster dismisses by stating, based on the documents he purports to have examined in both cases, that "Hatfill is no Richard Jewell." That sentence can reasonably be read as imputing the anthrax mailings to Hatfill. Indeed, since it contrasts Hatfill with a man who was wrongly accused of a heinous crime that terrorized the public, it would be hard to read the sentence any other way.

"The Message in the Anthrax" does contain references to the fact that the FBI was conducting an investigation into the anthrax mailings that occurred in the autumn of 2001. And the article also criticizes the FBI. But it does not take a literary forensicist to figure out that the focus of the article is Foster's investigation, not the FBI's. And to the extent the article is critical of the FBI, it is because the FBI has yet to reach Foster's conclusions about Hatfill.

Consider the following phrases culled from the article: "On balance, the St. Petersburg letters looked *to me* to be the work of a scientist." VF at 185 (Emphasis added). "*I analyzed* the letters from New Jersey;" "*I had a hunch* he'd turn up somewhere;" "*I searched* for Greendale schools elsewhere;" and "*I tried to imagine* the culprit's point of view, based on *my hypothesis* that an American scientist might be responsible." VF at 186 (Emphasis added). These and dozens of other references in the article refer to Foster's impressions about Hatfill and Foster's research that, in his mind, linked Hatfill to the anthrax mailings. Foster discusses in great detail the steps *he* took, the analysis *he* carried out, the theories *he* devised about the anthrax attacks and the efforts *he* made to sell those theories to the FBI. Foster claims ownership of the investigation he is describing again and again (for example, when he says, "In April, I met Rosenberg for lunch at an Indian restaurant in Brewster, New York, and compared notes. We

found that *our evidence* had led us in the same direction..." <u>VF</u> at 195, Emphasis added).  What was going on at the FBI while Foster was doing the work that led him to identify Hatfill as "my suspect" is barely mentioned.

Of course, Foster does at times tend to blur the line between the official governmental investigation and his own private endeavors. Statements like: "Barring further evidence, *we* would have to look for other extant writings by the anthrax killer...," <u>VF</u> at 188 (Emphasis added), might suggest that Foster and the FBI were working hand in glove.  But the article as a whole makes clear that Foster was *not* a member of the Amerithrax investigation team, and the "evidence" that convinced Foster to focus on Hatfill was not discovered as part of any official investigation. The fact that the FBI sent him a few documents to look at early in the investigation does not make him part of the Government's team. Therefore, Foster's report about his own work is not a report about the FBI's work.

In the same vein, Foster's principal criticism of the FBI's investigation is the Bureau's failure to pay more attention to his (Foster's) theories. Foster complains repeatedly in the article of being put off by the FBI. He complains that information gleaned from documents related to the case using "literary forensics" was "zero-filed" by the Bureau, <u>VF</u> at 188; that the anthrax task force was not paying attention to documents he deemed critical to the case, <u>id.</u>; that the task force ignored information that he sent to it, <u>VF</u> at 195-96; that he was told by the FBI that he might be spending too much time on the investigation, <u>VF</u> at 190; that his tender of a comparative handwriting sample elicited only a thank you call, <u>VF</u> at 190-95; that the FBI did not search Hatfill's home until after Foster's evidence was presented to the Senate Judiciary Committee staff, <u>VF</u> at 196; and that the FBI denied Foster's request to look at other documents

he thought might be relevant, id. To the extent that Foster's story is critical of the FBI's investigation, it is critical in the same way Kristof's columns were – i.e., it asserts "that the FBI should investigate Hatfill more vigorously because all of the evidence [known to Foster] pointed to him." Hatfill II, 416 F.3d at 333-34.

The Seventh Circuit's decision in Global Relief Foundation, Inc. v. N.Y. Times Co., 390 F.3d 973 (7th Cir. 2004) does not, as defendants urge, support a conclusion that Foster's article does no more than report on an official investigation.

In Global Relief, the court examined six different articles by different authors and concluded that each of them accurately reported that Global Relief Foundation ("GRF") was under investigation for ties to terrorism – i.e., that the "gist" of the articles was substantially true. Id. at 982. In opposing defendants' motion for summary judgment, plaintiff had submitted only two affidavits stating generally that GRF had no ties to terror. But GRF submitted no evidence challenging the truth of what was reported – namely, that it was under investigation for ties to terrorism. See id. at 983. The GRF articles contained very little in the way of evidence against GRF and prominently included statements from GRF's attorney denying that the group was involved in terrorism. Significantly, most of the articles talked about other organizations that were also under investigation for ties to terrorism. See id. at 985-86.

GRF lost donations and its reputation was harmed as a result of the articles. However, as the court ruled, "A person does not have a legally protected right to a reputation based on the concealment of the truth. This is implicit in the rule that truth – not just known truth . . . – is a complete defense to defamation." Id. at 989 (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1228 (7th Cir. 1993)) (internal citation omitted). The Seventh Circuit concluded that "the

sting of the articles was not that GRF was actually funneling money to terrorists but that the government was investigating the group for links to terrorism. . . The sting was that such an investigation was being conducted, not that GRF was guilty of the conduct for which it was being investigated." <u>Id.</u> at 990.

In other words, on a motion for summary judgment, the court concluded that the undisputed evidence demonstrated the truth of the allegedly false stories about GRF. It was indeed under investigation.

<u>Global Relief</u> is inapposite here on both procedural and substantive grounds. First, there is no motion for summary judgment pending here. The motions before the Court are motions to dismiss pursuant to Rule 12(b)(6). The complaint alleges, *inter alia*, that many of the statements in the article are false. I am required to, and do, assume that those allegations of falsity are true.

Moreover, the articles in <u>Global Relief</u> really were reports about an official investigation. Foster's article, as I have explained, is not. Unlike the <u>Global Relief</u> reporters, Foster went well beyond reporting on an official investigation or offering his opinion about that investigation. The article unmistakably implies that Hatfill is guilty of the anthrax murders, as suggested by Foster's evidence and Foster's investigation. That it also suggests the FBI is derelict in its duty for not focusing more attention on the man Foster refers to as "my suspect" does not render the article incapable of defamatory meaning.

"The Message in the Anthrax" also cannot be compared to the article discussed by the New York Court of Appeals in <u>Brian v. Richardson</u>, 87 N.Y.2d 46, 660 N.E.2d 1126 (1995). In <u>Brian</u>, as the Court of Appeals observed, the purpose of defendant Richardson's article "was to advocate an independent governmental investigation into the misuse of...software..." <u>Id.</u> at 53.

Foster had no need to write an article calling for a governmental investigation of either the anthrax murders or of Hatfill as a possible suspect; both were in progress. Indeed, by the time he wrote the article, the Department of Justice had publicly identified Hatfill as a "person of interest" in its ongoing investigation of the anthrax mailings. Of course, <u>Brian</u> was decided under New York, not Virginia, law. But it is distinguishable from this case on other grounds as well.

Foster wrote his article to place before the public his hypothesis that Hatfill mailed the anthrax-laden envelopes, to marshal the evidence that led him (a private citizen) to that conclusion, and to criticize the FBI for not following up on *his* leads, for "zero-filing" *his* evidence and failing to reach *his* conclusion. He assigned Hatfill's name to the "John Doe" he thought the authorities should charge with the crime, and he made his best case for why Hatfill was "no Richard Jewell." No reasonable reader could conclude that "The Message in the Anthrax" qualifies as a report of an official investigation.

*(iv) The Article Cannot be Fairly Read as "Opinion"*

Foster and CNP also argue that the article is nothing more than an expression of opinion – specifically, Foster's opinion about where the evidence in the anthrax investigation points. And indeed, when Foster climaxes his article with its most damning claim – "Hatfill is no Richard Jewell" – he takes care to begin the sentence with the words, "In my opinion..."

But as noted above, expressions of opinion may be actionable if they imply an assertion of objective fact. Under the standard set forth by the United States Supreme Court in <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18-19 (1990), which is closely followed in Virginia, Foster's article is clearly actionable. Foster expresses the opinion that Hatfill is a liar, a rascal and "no

Richard Jewell." In the context of the article, this last assertion is a flat out statement that Hatfill, unlike Jewell, is not wrongly suspected of committing a heinous and highly publicized crime. Where, as here, the article can fairly be read to impute commission of a crime to an individual, "...a defendant cannot escape liability for making a false assertion of fact by prefacing that assertion with the words 'in my opinion,'..." Hatfill II, 416 F.3d at 333 (citing Milkovich, 497 U.S. at 18-19).

At the end of the article, Foster inserts a disclaimer: "It is not my job to indict or to try my own suspect for the anthrax murders. . . . Even if the FBI should find hard evidence linking Hatfill to a crime, he will remain innocent until proved guilty." VF at 200. But that does not transform this article into opinion. As the Fourth Circuit ruled in Hatfill II, "neither can [a defendant] escape liability simply by pairing a charge of wrongdoing with a statement that the subject must, of course, be presumed innocent." 416 F.3d at 333-34.

Furthermore, defendants conveniently ignore Hatfill's alternative basis for liability – Foster's allegation that he is unfit to have security clearance or to work in the field of bioterrorism reseach. Foster's assertions on this point are not hedged with any "In my opinions." Foster baldly states his defamatory conclusions. This statement is no different than the statement of concern about a doctor's competence discussed above; it is demonstrably true or false, and so is actionable under Virginia law. Cf. Fuste v. Riverside Healthcare Ass'n, 575 S.E.2d 858, 861-62 (Va. 2003)

*(v) Plaintiff Sufficiently Alleges That the Article Is False*

Because the article is capable of being read as accusing Hatfill of being the anthrax killer, and of being unfit to work in the biodefense industry, Hatfill's denial that he mailed the anthrax

letters is sufficient to establish the falsity element. However, in an excess of caution, Hatfill has specifically pleaded that a number of specific statements in the article are themselves false, including the following:

(1) Hatfill was hired by USAMRIID in 1997 as "a concept man with a detailed vision for building mobile germ labs;"

(2) Hatfill once designed a "homemade spray disseminator" suitable for bioterrorism;

(3) in March 2002, Hatfill "was building a mobile germ lab out of an old truck chassis, and after S.A.I.C. fired him he continued to work on it using his own money;"

(4) "Biowarfare fiction" was Hatfill's "specialty," and his "responsibilities at USAMRIID included the writing of bioterror scenarios, at least one of which actually happened;"

(5) "the government hired Hatfill . . . to commission a paper from Bill Patrick," which paper allegedly described a hypothetical use of the U.S. mail to deliver aerosolized anthrax;

(6) FBI agents "found a canister of Bacillus thuringiensis, or B.t." in Hatfill's refrigerator – an allegation highlighted in a callout box containing the rather lurid photograph of Hatfill, standing in his kitchen wearing biohazard clothing (including a hood). The picture bears the caption, "HOME COOKING." For a 1998 article in Insight magazine, Steven J. Hatfill shows how a terrorist could concoct plague in a kitchen;"

(7) in August 2000, Hatfill "trained forces at MacDill Air Force Base, in Tampa, using a makeshift bioterror 'kitchen' lab that he built himself out of scavenged parts, as well as biosafety cabinets taken [or 'borrowed'] from USAMRIID," that were "suitable for turning germs into weapons" and "are still missing and are said to have been destroyed;"

(8) Hatfill "once spoke of how to use a pond in the Frederick Municipal Forest – a few miles from his former residence in Maryland – to dispose of toxins," and a search of Whiskey Springs Pond in Maryland "found a homemade biosafety cabinet;" and

(9) Hatfill "sprayed his trainees with samples of aerosolized B.g.," another anthrax stimulant.

Cmplt. ¶ 19 (amendment in original); see also Cmplt. ¶ 20 (additional allegations of falsehoods).

Whether any or all of these statements, or the implications that can be drawn from them (such as that Hatfill is the person who must have disposed of the cabinet in Whiskey Springs Pond), are in fact false is for another day. At this moment, in the context of a motion to dismiss, I assume that Hatfill's allegation of falsity is true.

*(vi) Plaintiff Sufficiently Alleges That Defamatory Implication Was Intended*

Defendants also argue that they are entitled to dismissal of the libel charge because the defamation is merely implied and the words used by Foster and published by CNP do not support the conclusion that the defamatory implication was intended. Chapin v. Knight-Ridder, Inc. 993 F.2d 1087, 1093 (4th Circ. 1993); Chaiken v. VV Publishing Corp., 907 F. Supp. 689, 698 (S.D.N.Y. 1995), aff'd 119 F.3d 1018 (2d Cir. 1997). I disagree.

Under Virginia law, if a plaintiff challenged the underlying "factual" assertions that support an article's conclusion as false, it is not necessary to show that defamatory implication was intended. As the Fourth Circuit found in Hatfill II, intent to defame is immaterial at the Rule 12(b)(6) stage under Virginia law. Id. at 334 n.7 (discussing Chapin, 993 F.2d at 1092-93). Since the district court was required to accept the assertions in the complaint as true, the Fourth Circuit deemed the defendant's reliance on Chapin premature. Id.

In this case, Hatfill not only alleged that the explicit and implicit accusations regarding his participation in the anthrax murders were false, but (as noted above) he specifically identified a number of other statements of purported "fact" that he claims are false. These allegations mean that any effort to obtain dismissal of the complaint on the ground of "lack of defamatory intent" are premature under Virginia law.

I reject categorically the notion that the words used do not support the conclusion that defamatory implication was intended. At the end of the article, Foster questions why a liar and a rascal like Hatfill was permitted to work in the sensitive and secretive biodefense industry, and overtly challenges his qualification for security clearance. This does more than imply that Hatfill was unfit to perform the work he was doing; it flat-out says so. Foster's use of the Richard Jewell comparison, in the overall context of the article, is more than sufficient for me to conclude, as a matter of law, that Foster intended to imply that Hatfill was the anthrax murderer. And Conde Nast's insertion of the editorial subheading, in which it stated: "Frustrated with the F.B.I.'s anthrax task force, [Foster] unseals his investigation of a most intriguing – *and disturbing* – suspect" is, at this very preliminary stage of litigation, sufficient to permit an inference of defamatory intent (which will ultimately be a question for the trier of fact).

C.    The *Reader's Digest* Article

1. The Article is Capable of Defamatory Meaning

Hatfill claims that RDA "recklessly republished" the Vanity Fair article in its December 2003 issue, despite possessing "all of the same 'red flags' regarding the veracity of Foster's article that defendant CNP had" as well as correspondence from Hatfill's counsel warning of the "serious methodological shortcomings in defendant Foster's 'literary forensic' analysis in the anthrax case." Cmplt. ¶¶ 30, 31.

*(i) Tracking the Anthrax Killer: A Summary*

The <u>Reader's Digest</u> article, "Tracking the Anthrax Killer" republishes large portions of the <u>Vanity Fair</u> article. <u>See</u> Donald Foster, "Tracking the Anthrax Killer," <u>Reader's Digest</u>, Dec. 2003 at 152-69 ("<u>RD</u>"). However, it lacks many of the <u>Vanity Fair</u> article's extraneous incidents and characters. It does not, for example, discuss Bill Patrick, the biowarfare expert. <u>Id.</u> It also lacks many of the <u>Vanity Fair</u> article's more defamatory elements, including the comparison between Mr. Hatfill and Richard Jewell, the "trail him like a vapor cloud" image, the suggestion that Hatfill home-brews anthrax as a hobby, and his alleged use of Frederick Municipal Forest to dump toxic waste. <u>Id.</u> The <u>Reader's Digest</u> article softens a few of the Vanity Fair article's more scandalous allegations, including the one about Hatfill's alleged ties to the 1978 Rhodesian anthrax outbreak, <u>RD</u> at 163-64. It refers to the mobile lab Hatfill was allegedly building as a "*mock* mobile lab." <u>RD</u> at 164-65 (Emphasis added).

However, the <u>Reader's Digest</u> article retains Foster's central theme – that Hatfill was the author's prime, and indeed sole, suspect in the anthrax case. <u>RD</u> at 168. Indeed, that implication may be strengthened by the <u>Reader's Digest</u> article's more lurid title, "Tracking the Anthrax Killer." The article also retains allegations that the Hatfill's diploma was a forgery and that his resumes were full of lies. <u>RD</u> at 166.

*(ii) The Article As a Whole Can Be Read as Defamatory*

I find that this article also is capable of defamatory interpretation. A number of statements in the article fairly imply that Hatfill committed the anthrax murders. The article's title (which, for the moment, I will assume was written by RDA, not Foster) is blunt: "Tracking the Anthrax Killer." In the table of contents, the following a subheading appears under the title of the article and Foster's name: "Everyone assumed the poison letters were sent by Islamic terrorists. *I knew these evil acts were all American*." <u>RD</u> at 5 (Emphasis added). The cover even

-34-

promises, "PLUS The Anthrax Murders: New Evidence." From the beginning, a reader is led to expect evidence about "the killer" – not just "a suspect."

The article contains no suggestion that anyone but Hatfill might have committed the anthrax murders. Foster writes, "The quality and source of the [anthrax] powder coupled with the misspellings and helpful warnings – all were leading me to suspect an American scientist. Somebody was trying to deliver a message." RD at 158. Six pages later, Foster identifies the scientist, "I was now zeroing in on Steven Hatfill." RD at 164. Like the Vanity Fair article, this article clearly states that *Foster* was investigating Hatfill (and no one else) for the anthrax murders. As in the Vanity Fair article, the unmistakable focus of this article is that a great deal of circumstantial evidence pointed to Hatfill – and Hatfill alone – as the perpetrator of the anthrax mailings.

Of course, the Reader's Digest article "is shorter, and therefore many of the false and defamatory statements made in the Vanity Fair article are absent.... However, the gist of the article is still to the effect that Dr. Hatfill is responsible for the anthrax murders as well as several of the anthrax hoaxes." Cmplt. ¶ 31. While this allegation in the complaint is conclusory, and so is entitled to no presumption of truth, after reading the article I conclude that a reasonable reader could so interpret the piece.

Hatfill also alleges that, "Like its Vanity Fair precursor, the Reader's Digest article ends by taking direct aim at Dr. Hatfill's fitness to serve in the nation's biodefense program," causing Hatfill to suffer "severe reputational, emotional and economic harm." Cmplt. ¶¶ 35, 36. For example, the callout on page 165 states, "HATFILL MAY HAVE USED A FORGED PH.D. TO GET GOVERNMENT JOBS." Furthermore, it alleges the connection between Hatfill and the Rhodesian anthrax epidemic with another callout: "EXPERTS THINK THE ANTHRAX EPIDEMIC IN RHODESIA WAS DELIBERATE." RD at 163. Foster also writes, "Hatfill had

been in apartheid-era Rhodesia, where . . . he witnessed the worst outbreak of anthrax ever encountered," and, "That the outbreak was 'natural' is debatable. . ." RD at 163-164. Foster goes on to note that "some suspect" it might have been carried out by the Selous Scouts, and then, a few lines later, notes that Hatfill was a member of that group. Id.

Just because the Vanity Fair article included more offensive details does not mean that the Reader's Digest version is not defamatory if it is in fact untrue. The "unmistakable theme" of *both* articles is that Hatfill (1) committed the anthrax murders, and (2) lied about his past and credentials to obtain employment in the biodefense field. Additionally, Reader's Digest's selection of a title undoes whatever good might have been done by editing out some (though not nearly all) of the allegations and implications that Hatfill alleges are false.

*(iii) None of the Defenses To Defamation Shields the Reader's Digest*
*Article*

For the same reasons that "The Message in the Anthrax" could not fairly be described as just a report and critique of the FBI investigation,"Tracking the Anthrax Killer" cannot hide behind this shield. Like the Vanity Fair article, "Tracking the Anthrax Killer" focuses on Foster's own investigation, his musings, his theories and his conclusion. Indeed, in this condensed version of the story, Foster goes out of his way to accuse "the press" of "dumping" on the FBI and to draw an implicit contrast between "the press" and himself. RD at 168.

Also for the reasons discussed in connection with the Vanity Fair piece, the Reader's Digest article does not qualify as mere "opinion."

Finally, I conclude that the words used by Hatfill in "Tracking the Anthrax Killer" support a conclusion that defamatory implication was intended. The Reader's Digest article contains a longer disclaimer about the possibility that Hatfill might not be the killer than does "The Message in the Anthrax." Foster tries to temper his indictment of Hatfill at the end of the

piece:

> Whether Hatfill was involved or not, it isn't my intention to accuse him of the anthrax murders. Although I believe an American scientist was involved, Hatfill could be declared beyond suspicion in this matter tomorrow – that may have already happened by the time you read this. Most importantly, there's no hard evidence linking Hatfill to a crime.

RD at 168. However, as the Fourth Circuit concluded in Hatfill II, 416 F.3d at 333-34, such boilerplate language does not outweigh the message of the article that Foster has found the anthrax murderer.

The condensed article also includes Foster's bald statement that Hatfill ought never to have been given security clearance and was unfit to be a government bioterror expert. The article states plainly that Hatfill's diploma was a forgery, retains the allegation that he is a "rascal," and questions in yet another callout "HOW DID HATFILL GET CLEARANCE TO HANDLE A VIRUS LIKE EBOLA?" RD at 168. Since imputing unfitness for one's profession is *per se* libelous, defamatory intent can be conveyed by these allegations alone.

Because Hatfill's claims against RDA are governed by Virginia law, his pleading suffices to negate the need for plaintiff to allege defamatory intent against the publisher.

D. *Plaintiff has stated a claim against CNP for the Reader's Digest article.*

Plaintiff seeks to hold CNP liable for the publication of "Tracking the Anthrax Killer" in Reader's Digest. He asserts in the complaint, "Republication of the Vanity Fair article by defendants Foster and RDA was reasonably foreseeable at the time it was first published, and . . . the republication in Reader's Digest was specifically authorized by defendant CNP, such that CNP is equally liable for that republication." Cmplt. ¶ 47. These allegations are sufficient under

Virginia law to require CNP to respond to the claim; I cannot dismiss it at the pre-answer stage.[2] See Weaver v. Beneficial Fin. Co., 98 S.E.2d 687, 690 (Va. 1957) (under Virginia law, a publisher may be held liable for another entity's republication of defamatory material if "it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication"); see also Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 687 (4th Cir. 1987).

## IV.    Intentional Infliction of Emotional Distress

Under Virginia law, a plaintiff claiming intentional infliction of emotional distress must allege that (1) the defendant's conduct was intentional and reckless; (2) the conduct was outrageous and intolerable; (3) the conduct caused the plaintiff emotional distress; and (4) the plaintiff's distress was severe. Hatfill II, 416 F.3d at 336. Virginia courts permit concurrent claims of defamation and intentional infliction of emotional distress. See id.; see also Cobbs v. Virginia, 55 Vir. Cir. 1 (Va. Cir. Ct. 2001); Graham v. Oppenheimer, 2000 WL 33381418 (E.D. Va. Dec. 15, 2000); Lewis v. Gupta, 54 F. Supp. 2d 611 (E.D. Va. 1999).

The Hatfill II court found that plaintiff had stated a claim for intentional infliction of emotional distress, because the conduct of the New York Times in publishing the allegedly

---

[2] Hatfill argues in his brief that RDA "made a specific request to release Foster" from an exclusive contract with CNP so that RDA could republish the Vanity Fair article. (Pl.'s Consol. Resp. to Defendants' Motions to Dismiss and Motions to Transfer Venue, dated Nov. 8, 2004, at 25.) He further states that, "[I]n exchange for releasing Foster and expressly permitting" RDA to republish, CNP "received financial compensation." (Id.) If true, Conde Nast would be hard pressed to escape liability, if any exists, for RDA's republication. However, since this is not a motion for summary judgment, I do not consider these arguments – which do not appear in the complaint – here. At this stage, it is enough that plaintiff *alleged* in his complaint that republication was both foreseeable and specifically authorized by Conde Nast. I am required to assume those allegations are true for purposes of these motions to dismiss.

defamatory articles by Kristof was sufficiently extreme and outrageous. <u>Hatfill II</u>, 416 F.3d at 337. That court rejected the argument – also advanced in this case – that plaintiff was attempting to circumvent constitutional limitations on recovery for defamation:

> We are confident . . . that the relevant constitutional limitations cannot be avoided as easily as The Times imagines. If Hatfill ultimately cannot prevail on his defamation claims because he is unable to satisfy constitutional requirements for recovery, then he likely will be unable to prove that The Times' misconduct was intentional or reckless or that such misconduct was sufficiently outrageous to warrant recovery. As this stage of litigation, our sole concern is whether Hatfill's allegations, taken as true, describe intentional and outrageous misconduct. We conclude that they do.

<u>Id.</u> at 336-37.

The <u>Hatfill II</u> court also held that Rule 8 does not require plaintiff to allege his resulting emotional distress more specifically than to state that it was severe, and that it resulted from the publication of the allegedly defamatory statements. <u>Id.</u> at 337.

Based on <u>Hatfill II</u> and Virginia's history of allowing concurrent defamation and intentional infliction of emotional distress claims, I cannot dismiss the intentional infliction of emotional distress claims because Virginia law governs those claims.

## V.     Injurious Falsehood – Commercial Disparagement

In New York, "injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business or property." <u>Nevin v. Citibank</u>, 107 F. Supp. 2d 333, 345 (S.D.N.Y. 2000) (internal citation omitted). However, a claim for injurious falsehood is properly dismissed as duplicative where the claim "relies on the same statements that form the basis of the defamation claim." <u>O'Brien v. Alexander</u>, 898 F. Supp. 162, 172 (S.D.N.Y. 1995), <u>aff'd in part and rev'd in part on other grounds</u>, 101 F.3d 1479, 1488 (2d Cir. 1996).

This court can find no source, and plaintiff has cited none, indicating that Virginia law

recognizes a claim for injurious falsehood separate and apart from defamation. However, the claim appears to be purely duplicative and, should plaintiff prevail, his damages for the alleged libel would be the same as his damages for injurious falsehood. I therefore dismiss those counts as against all defendants.

## Conclusions

For the foregoing reasons, defendants' motions to dismiss are denied except to the extent

of dismissing the seventh cause of action, for injurious falsehood, as duplicative.

This constitutes the decision and order of the Court.

Dated: November 2, 2005

_____

U.S.D.J.


BY FAX TO ALL COUNSEL